**COALITION TO SAVE OUR CHILDREN, Plaintiff,**

v.

**STATE BOARD OF EDUCATION OF the STATE OF DELAWARE, the Board of Education of the Brandywine School District, the Board of Education of the Christina School District, the Board of Education of the Colonial School District, and the Board of Education of the Red Clay Consolidated School District, and Delaware House of Representatives Committee on Desegregation, Defendants.**

**Civ. A. No. 56–1816–1822–SLR.**

United States District Court,
D. Delaware.

Aug. 14, 1995.

---

gules, of Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, Delaware.

David H. Williams, and Barbara D. Crowell, of Morris, James, Hitchens & Williams, Wilmington, Delaware, attorneys for the Brandywine, Christina, and Colonial School Districts.

Alfred J. D'Angelo, Jr., M. Duncan Grant, and Kathryn A. Kelly, of Pepper, Hamilton & Scheetz, Wilmington, Delaware, attorneys for the Red Clay Consolidated School District.

Donald E. Marston, of Williams, Sullivan, & Marston, Wilmington, Delaware; and Charles J. Cooper, and Michael W. Kirk, of Shaw, Pittman, Potts & Trowbridge, Washington, DC, attorneys for Delaware House of Representatives Committee on Desegregation.

Victor F. Battaglia, of Biggs & Battaglia, Wilmington, Delaware; Leonard L. Williams, Wilmington, Delaware; Thomas D. Barr, David Boies, Sandra C. Goldstein, and Katherine B. Forrest, of Cravath, Swaine & Moore, New York City; and Thomas J. Henderson, Sharon R. Vinick, Washington, DC; and Pace J. McConkie, Salt Lake City, UT, of Lawyers' Committee for Civil Rights Under Law, attorneys for plaintiff.

Bertram S. Halberstadt, Wilmington, Delaware, and Sandra Del Valle, New York City, attorneys for Intervening Hispanic Plaintiffs.

Rodman Ward, Jr., Andrew G. Bouchard, Daniel V. Folt, and Joel E. Friedlander, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware; and M. Jane Brady and Ann Woolfolk, Wilmington, DE, attorneys for the State Board of Education of the State of Delaware. OF COUNSEL: David J. Mar-

## OPINION

SUE L. ROBINSON, District Judge.

### I. INTRODUCTION

Under consideration is a motion filed by defendants[1] seeking a declaration of "unitary status."[2] (D.I.1542) Having reviewed the materials submitted by the parties during the evidentiary hearing held in this matter,[3] in light of the history of school desegregation litigation in this country, the court is satisfied that the defendants at bar have carried their burden of proof and that the school districts of Northern New Castle County have attained unitary status.

### II. BACKGROUND

Although there has always been a perceived link in this country between the duties of citizenship and the need for education,[4] the Constitution of the United States is silent on the issue of education. The power to control

1. The moving defendants are the Board of Education of the State of Delaware (hereafter the "State Board"), and the Boards of Education of the Red Clay Consolidated School District ("Red Clay") and the Brandywine, Christina, and Colonial School Districts (collectively referred to as the "4 districts" or, with the State Board, as "defendants"). Although not a moving defendant, the Delaware House of Representatives Committee on Desegregation was allowed to intervene as a party defendant and shall be included within the designation "defendants."

2. The Hispanic Intervenors have not joined in opposition to the motion. (D.I.1935 at 567–598)

3. The evidentiary hearing was held December 19, 1994, through January 6, 1995.

4. In 1765, John Adams, in denouncing the tyranny of the Colonial government, declared that "[l]iberty cannot be preserved without a general knowledge among the people...." *The American Reader,* edited by Diane Ravitch, Harper Collins, 1990, at 13.

the education of American children was one reserved to the states and, in turn, delegated to the local community. Thus, there was never an "equivalent of Britain's Education Act of 1870 [which] ushered in a national system of public education in the United States."[5] Instead, the organization of public school systems in the United States was undertaken over time at the local level, community by community. Public primary schools, organized on a neighborhood basis and, therefore, relatively homogeneous in class and ethnic backgrounds, were fairly commonplace by the mid-nineteenth century.[6] By this time, the right of American citizens[7] to publicly funded schooling was not so much debated as was the role of public education— to promote assimilation or to preserve cultural diversity.[8]

With the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments, the obligation to provide publicly funded education for black citizens led in many parts of the country (including Delaware) to the founding of separate school systems for blacks, which schools were provided with meager resources for the many waiting to be served. The movement to eliminate these "dual" school systems culminated in the seminal case of *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*"Brown I"*).

The Supreme Court in *Brown I* accepted the proffered findings that

> the Negro and white schools involved have been equalized, or are being equalized, with respect to buildings, curricula, qualifications, and salaries of teachers, and other "tangible" factors. Our decision, therefore, cannot turn on merely a comparison of these tangible factors in the Negro and white schools involved in each of the

cases.[9] We must look instead to the effect of segregation itself on public education.

*Id.* at 492, 74 S.Ct. at 690–91. Again recognizing education as "the very foundation of good citizenship" and "the opportunity of an education" as the key to "succe[ss] in life," the Court declared that "[s]uch an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Id.* at 493, 74 S.Ct. at 691. The Court went on to hold that "equal educational opportunities" were not afforded to children who were "separate[d] from others of similar age and qualifications solely because of their race," because segregation sanctioned by law "generates a feeling of inferiority as to [the children's] status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.*

Having decreed that "[s]eparate educational facilities are inherently unequal," *id.* at 495, 74 S.Ct. at 692, the Court in *Brown v. Board of Education of Topeka*, 349 U.S. 294, 299, 75 S.Ct. 753, 755–56, 99 L.Ed. 1083 (1955) (*"Brown II"*), addressed the question of how best to accomplish "the transition to a system of public education freed of racial discrimination." Although acknowledging that "substantial steps to eliminate racial discrimination in public schools ha[d] already been taken" in communities such as Delaware, the Court nonetheless remanded the cases and directed the lower courts to implement the constitutional principles announced in *Brown I and II.*

> In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the

5. *Schooling For All*, Ira Katznelson and Margaret Weir, Basic Books, Inc., 1985, at 29.

6. *Id.* at 33, 53.

7. At this juncture, of course, the designation of "American citizen" generally applied only to white males owning some modicum of property.

8. The Irish in Chicago, for instance, opposed the proposal in 1865 by German organizations that the German language be taught in the public

school system; the argument made against the proposal was that the "function of public schools was to eliminate rather than promote ethnic diversity." *Schooling For All* at 54.

9. The cases reviewed under the consolidated opinion issued in *Brown I* came to the Court from the States of Kansas, South Carolina, Virginia, and Delaware.

exercise of these traditional attributes of equity power. **At stake is the personal interest of the plaintiffs in admission to public school as soon as practicable on a nondiscriminatory basis.** To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.

While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining **admission to the public schools on a nonracial basis,** and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a **transition to a racially nondiscriminatory school system.** During this period of transition, the courts will retain jurisdiction of these cases.

*Id.* at 300–01, 75 S.Ct. at 756 (emphasis added).

Prior to *Brown I,* the Delaware Supreme Court had ordered the immediate admission of black children to schools previously attended only by white children. *Gebhart v. Belton,* 33 Del.Ch. 144, 91 A.2d 137 (Del. Supr.1952). However, that court also ruled that no school district could lawfully desegregate more rapidly than the State Board permitted. *Steiner v. Simmons,* 35 Del.Ch. 83, 111 A.2d 574 (Del.Supr.1955). In response to the *Steiner* holding, a class action was filed in 1957 by black children to compel their admission into the public schools of the state on a racially nondiscriminatory basis. *Evans v. Buchanan,* 152 F.Supp. 886 (D.Del.1957), *aff'd in part and vacated in part,* 256 F.2d 688 (3d Cir.1958). Subsequently, the United States Court of Appeals for the Third Circuit, in its decision captioned *Evans v. Ennis,* 281 F.2d 385 (3d Cir.1960), *cert. denied,* 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961), rejected defendants' plan to desegregate the Delaware public school system on a grade-by-grade basis over a period of 12 years, holding that such a plan "[did] not follow the intent and substance of the rulings of the Supreme Court" in *Brown I. Id.* at 387. The defendants had argued in support of their plan that the State's formerly all-white facilities were inadequate to absorb all of the State's black school children. Noting first that "a large number of Negro children [may] not seek integration even when offered the opportunity," the court observed:

> Doubtless integration will cost the citizens of Delaware money which otherwise might not have to be spent. The education of the young always requires, indeed demands, sacrifice by the older and more mature and resolute members of the community. Education is a prime necessity of our modern world and of the State of Delaware. We cannot believe that the citizens of Delaware will prove unworthy of this sacred trust.

*Id.* at 389. On rehearing, the court concluded:

> It is obvious that in the years to come more and more Negro children will seek integration into the public schools of Delaware and that this desire must be implemented in accordance with the decisions of the Supreme Court in [*Brown I and II* ]. As time passes and the number of Negro children seeking integration increases, modifications and enlargements of school

facilities will be required. The State Board of Education, the State Superintendent of Public Instruction and the Local Boards can effect such changes and modifications as may be required with the approval of the court below. **Eventually a wholly integrated school system will be effected for Delaware: "wholly integrated" in the sense that all school children, whether white or Negro, whose attendance at school is required by law at public schools ... will attend public schools without regard for race or color.** *Id.* at 391–92 (emphasis added). The defendants were ordered to develop a "modified plan which [would] provide for full integration of all grades of the public schools of Delaware commencing with the Fall term of 1961." *Id.* at 390.

Although the Third Circuit opined in 1960 that many of the schools in the Wilmington metropolitan area had already been "integrated," *id.* at 393, an action subsequently was brought complaining that black children in Wilmington were being compelled to attend segregated schools. This action was predicated on several post-*Brown* decisions rendered by the Supreme Court in which the ultimate goals of *Brown I and II* were further delineated. As explained, for example, in *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the immediate goal under *Brown II* was "making an initial break in a long-established pattern of excluding Negro children from schools attended by white children. The principal focus was on obtaining for those Negro children courageous enough to break with tradition a place in the 'white' schools." *Id.* at 435–36, 88 S.Ct. at 1692–93.

Under *Brown II* that immediate goal was only the first step, however. **The transition to a unitary, nonracial system** of public education was and is the ultimate end to be brought about.... *Brown II* was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which would require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a **unitary system in which racial discrimination would be eliminated root and branch.**

*Id.* at 436, 437–38, 88 S.Ct. at 1693, 1694 (emphasis added). In *Green,* the Court rejected a "freedom-of-choice" plan which did not eliminate the

[r]acial identification of the system's school[s] ... extending not just to the composition of student bodies ... but to every facet of school operations—faculty, staff, transportation, extra-curricular activities and facilities.

*Id.* at 435, 88 S.Ct. at 1693.

In *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the Supreme Court turned once more to "the problem of defining in more precise terms than heretofore the scope of the duty of school authorities and district courts in implementing *Brown I* and the mandate to eliminate dual systems and establish unitary systems at once." *Id.* at 6, 91 S.Ct. at 1271. Although the Court declared that its "objective ... [was] to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race," *id.* at 23, 91 S.Ct. at 1279, the Court proceeded to analyze the desegregation process in terms of the "*Green* factors," that is, the "existing policy and practice [of the school authorities] with regard to faculty, staff, transportation, extra-curricular activities, and facilities ... [,] the most important indicia of a segregated system." *Id.* at 18, 91 S.Ct. at 1277. *See also, Wright v. Council of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).[10]

---

**10.** Nevertheless, the Court observed that its concern in desegregation cases was

the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the cases from *Brown I* to the present was the dual school system. The elimination of racial discrimination in public schools is a

The court in *Evans v. Buchanan*, 379 F.Supp. 1218 (D.Del.1974), likewise stated that the goal of the State Board must be a "unitary school system, a 'system without a "white" school and a "Negro" school, but just schools.'" *Id.* at 1222, *citing Green*, 391 U.S. at 442, 88 S.Ct. at 1696. The court found that facially neutral geographic attendance zones had been adopted by the Wilmington Board of Education and acknowledged that 83% of the children in the Wilmington School District were black. The presence of racially identifiable schools in the formerly *de jure* segregated system, however, was found to be constitutionally suspect. The court ordered that an alternate desegregation plan be submitted, but reserved decision on whether or not a remedy confined to the Wilmington School District would satisfy existing constitutional requirements. Within months of the above decision, the Supreme Court issued its opinion in *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

The district court in *Milliken* had ordered the consolidation of some 53 (out of a total of 85) suburban school districts (primarily white in student composition) with the Detroit, Michigan metropolitan school district (primarily black in composition) to comprise a "desegregation area," in order to "achieve the greatest degree of actual desegregation to the end that, upon implementation, no school, grade or classroom [would be] substantially disproportionate to the overall pupil racial composition." *Id.* at 734, 94 S.Ct. at 3122. As characterized by the Supreme Court, such a desegregation plan was based on the assumption

> that the Detroit schools could not be truly desegregated ... unless the racial composition of the student body of each school substantially reflected the racial composition of the population of the metropolitan area as a whole. The metropolitan area was then defined as Detroit plus 53 of the outlying school districts....

large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of *Brown I* to seek to use school

In *Swann,* which arose in the context of a single independent school district, the Court held:

> "If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse."
> ...

The clear import of this language from *Swann* is that **desegregation, in the sense of dismantling a dual school system, does not require any particular racial balance in each "school, grade or classroom."** ...

[T]he notion that school district lines may be casually ignored or treated as a mere administrative convenience is contrary to the history of public education in our country. No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process.

*Id.* at 740–42, 94 S.Ct. at 3125–26 (emphasis added) (citations omitted). The Court, having reiterated that the "target of the *Brown* holding was clear and forthright: the elimination of state-mandated or deliberately maintained dual school systems with certain schools for Negro pupils and others for white pupils," rejected the imposition of an inter-district remedy. *Id.* at 737, 94 S.Ct. at 3123.

Not so the court in *Evans v. Buchanan,* 393 F.Supp. 428 (D.Del.), *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). Reasoning that the State of Delaware, unlike the State of Michigan, had required segregation by race in its schools, the court held:

> [T]o the extent that segregation imposed by state law has had inter-district effects, federal courts can fashion appropriate inter-district remedies. In short, this Court,

desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination.
402 U.S. at 22–23, 91 S.Ct. at 1279.

in light of the *Milliken* holding, is authorized to consider desegregation relief embracing more than the Wilmington district only upon findings either that school districts in New Castle County are not meaningfully separate and autonomous, or that there have been racially discriminatory acts of the state or of local school districts causing inter-district segregation.

*Id.* at 432. The court thereafter found several interdistrict violations.[11] Once again, the parties were ordered to submit alternative plans, both within the present boundaries of the Wilmington School District and incorporating other areas of New Castle County, to remedy the segregation found by the court.

By decision issued in May of 1976, the court held that an interdistrict remedy was necessary, namely, the consolidation of city and suburban school districts. Even while so deciding, the court acknowledged that

[t]he operation of public schools is traditionally a matter of local concern, and properly so. This court has intervened only reluctantly in that process, and only for limited purposes. We were urged throughout the hearings in this case to be concerned with the "quality of education" offered by the area schools. That is much more properly the concern of local officials and the parents of children in the schools. Our duty here is not to impose quality education even if we could define that term, though we must be conscious that the implementation of the remedy does not defeat the ability of local agencies to fulfill their duty to offer it. **We do not find in [*Brown I and II* ] a mandate for District Courts to concern themselves with how well the educative function is performed. The decision in *Brown* was rather that the operation of a dual school system, based on race, is an im-**permissible **classification under the Fourteenth Amendment. There has been much discussion, and there undoubtedly will continue to be much writing upon the topic of whether black children learn better in desegregated classrooms. Our holding does not rest upon these considerations, not least because judges are unqualified and inexpert in answering such questions.** Rather, we have found a constitutional violation in the racially suspect treatment of Wilmington during a school district reorganization,[12] and other actions in the past by the State and local authorities. We believe that those violations, upon the implementation of this Opinion, will be remedied.

*Evans v. Buchanan,* 416 F.Supp. 328, 364–65 (D.Del.1976) (emphasis added). The district court's decision was affirmed on appeal with one significant exception: The Third Circuit expressly disapproved of a 10–35% black student enrollment criterion proffered by the district court and specifically held "that no particular racial balance will be required in any school, grade, or classroom." *Evans v. Buchanan,* 555 F.2d 373, 380 (3d Cir.), *cert. denied,* 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

By mandate issued in January of 1978 (the "1978 order"), the district court, characterizing its role as "limited" in the last "narrow remedial phase of this litigation," *Evans v. Buchanan,* 447 F.Supp. 982, 989 (D.Del.), *aff'd,* 582 F.2d 750 (3d Cir.1978), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980), ordered into effect a scheme for desegregation which included both primary and ancillary remedial relief. The primary remedy involved pupil assignment and the creation of a single school district to serve the "desegregation area" established by the

---

**11.** The violations included: 1) the enactment of the Educational Advancement Act of 1968, which excluded from consideration for consolidation with other school districts the Wilmington School District; 2) the location of public housing projects; 3) state subsidies for the interdistrict transportation of students attending private schools; 4) the establishment by the Wilmington School Board of optional attendance zones; 5) the recordation of deeds containing racially re-strictive covenants; 6) portions of the Federal Housing Administration's mortgage underwriting manual; 7) portions of the Delaware Real Estate Commission handbook; 8) the interdistrict transportation of students attending all-black or all-white schools prior to *Brown I. Compare, Milliken,* 418 U.S. at 746–52, 94 S.Ct. at 3128–31.

**12.** Apparently referring to the Educational Advancement Act of 1968.

court.[13] More specifically, the defendants were ordered to implement a pupil assignment plan based upon the "mandatory transportation of students," which plan reassigned all students from the geographic area of the predominantly black districts (Wilmington and DeLaWarr) to the geographic area of the predominantly white districts for nine years and all students from the geographic area of the predominantly white districts to the predominantly black districts for three consecutive years. The 1978 order did not mandate a certain percentage of racial balance which must be achieved by each school. "In implementing a 9–3 pupil assignment concept and managing school affairs, the NCCPBE [14] retains the flexibility to alter attendance area boundaries, modify elementary attendance zone lines, adjust geocodes, employ lateral transfers, break feeder patterns if required, and utilize any other reasonable desegregation tool to achieve what is in its opinion the optimal 9–3 configuration. Because preservation of NCCPBE flexibility is regarded as of the utmost importance, the New Board's decisions with respect to pupil assignment will not be questioned **so long as a 9–3 fit and the few parameters imposed above are met.**" *Id.* at 1008 (emphasis added).

The ancillary relief ordered is set forth *verbatim* below:

### 1. *In–Service Training*

Administrators, faculty and other staff require orientation and training for desegregation. Therefore, the Board shall formulate and implement a comprehensive in-service training program for teachers, administrators and other staff in order to train personnel to cope with the desegregation process.

### 2. *Reading and Communication Skills*

The Board shall institute an affirmative reading and communication skills program, which does not resegregate the pupils, in order to remedy the effects of the past discrimination.

### 3. *Curriculum*

The Board shall provide curriculum offerings and programs which emphasize and reflect the cultural pluralism of the students, and all instructional materials, texts and other curriculum aids shall be free of racial bias.

### 4. *Counseling and Guidance*

To ameliorate the pressures on students undergoing desegregation and to prevent resegregation under the guise of curriculum or program choices, the Board shall institute an effective and nondiscriminatory counseling and guidance program. This counseling and guidance program must insure that students are counseled on a racially nondiscriminatory basis concerning all programs available in the area of work opportunities and opportunities for a college education; and that the students who choose the vocational and other special public schools in the area do so on an nondiscriminatory, and non-segregated basis.

### 5. *School Building Construction, Site Selection and Use of Existing Schools*

Selection of school sites, construction of new buildings, expansion of existing buildings, and closing of school buildings have an important bearing on the future status of desegregation in this area. The Board shall establish and enforce nondiscriminatory guidelines for new construction, review of building needs and the appropriateness of each proposed building project or school closing.

### 6. *Recognition of Human Values*

In order to protect the individual dignity of students and teachers and to prevent racial myths and stereotypes from prevailing in schools undergoing desegregation, the Board shall provide an appropriate human relations program throughout the unitary school system.

---

13. The "desegregation area" included those areas previously served by the following former school districts: Alfred I. duPont, Alexis I. duPont, Claymont, Conrad, DeLaWarr, Marshallton–McKean, Mount Pleasant, New Castle–Gunning Bedford, Newark, Stanton, and Wilmington. (D.I.530, 699)

14. The "New Castle County Planning Board of Education," the then governing body of the new consolidated school district, also referred to as "the Board" in the 1978 order.

### 7. Standards of Conduct

The Board shall develop as part of its Board policies a code of rights and responsibilities regarding such issues as student conduct and suspension and expulsion. This code shall provide for racially nondiscriminatory discipline and shall contain provisions to insure each student in the desegregation area procedural and substantive due process required by existing law. Such a code will help to provide equal educational opportunity to all students by protecting them from unreasonable, discriminatory, and arbitrary rules; and the Board shall not administer the code on a racially selective or otherwise biased basis.

### 8. Staff

The Board shall reassign faculty, administrative and other staff personnel to insure that schools do not retain their former racial identity through racially identifiable faculty and staff assignments.

(D.I. 699 at 11–13)

Three years later, in a decision characterized by the court as the "beginning of the process of shifting power from a court-created entity back to where it belongs—with appropriate state authorities," the court approved an application to divide the desegregation area into four proposed independent districts. *Evans v. Buchanan,* 512 F.Supp. 839, 847 (D.Del.1981). In so doing, the court nonetheless specifically held that "a unitary school system ha[d] not yet been achieved" and that "remnants of the dual system have not yet been extirpated," as evidenced by examples of "racially identifiable [schools] or severely imbalanced classrooms," "continued racial identifiability of some schools' facilities and administrative staffs," and "a possible problem of racially disproportionate suspensions and other forms of discipline." *Id.* at 851 and 858 n. 55.[15] The 1978 order was modified to require the four new school dis-

tricts to collect data regarding the following: 1) suspensions, expulsions, and arrests, by race; 2) student racial composition of the school buildings and classrooms, by race; 3) racial composition of all staff; 4) racial composition of the student population in special education programs; 5) students who have received permission to attend schools outside their feeder patterns, by race and grade; 6) enrollment projections and trends by race, grade, building and district; 7) enrollment changes, with racial percentages; 8) number of student withdrawals by race; 9) the operation of the bilingual education program; 10) the operation of all the ancillary relief programs ordered in the past. In addition, the State Board was charged with: 1) analyzing and summarizing the district data; 2) preparing and implementing a system of testing and evaluating the educational progress of the students, the results of which were to be reported by race, grade, and school building; and 3) reporting "its affirmative actions to its responsibilities" under the orders of the court. (D.I. 1074)

In May 1989, the State Board suggested that each school district bring the racial composition of its student population at each of its schools to within ± 10% of the minority percentages for each grade level in the district by September 1991. (D.I. 1934 at 330) In the spring of 1990, Red Clay[16] submitted to the State Board a plan to achieve compliance with the above request. The plan described a fully developed student reassignment component (a "mixed feeder plan") and a "choice" or "magnet school" component to be developed and submitted to the State Board by September 1990. Plaintiff[17] filed a motion in May 1990 seeking a court order directing implementation of the student reassignment component in September 1990; the motion was denied. *Coalition to Save Our Children v. Buchanan,* 744 F.Supp. 582 (D.Del.1990) at 330–31.

---

**15.** Plaintiffs identified at this time a number of problems they characterized as vestige effects of *de jure* segregation, including: "[R]esegregation in classrooms apparently caused by ability grouping and tracking, racially disproportionate discipline rates, and schools that are racially identifiable by reason of the pattern of assignment of teachers and administration." *Id.* at 863.

**16.** One of the four new districts created in 1981, which districts are among the defendants at bar.

**17.** The history of how plaintiff at bar came to represent the black plaintiff class is reported in this court's March 2, 1994 memorandum opinion. (D.I.1649)

Red Clay continued to work toward implementation of its "CHOICE" plan, which plan would require that the court modify the 9–3 student assignment provision of the 1978 order. Plaintiff questioned the plan on several bases, including: 1) "The plan's lack of an explicit 'commitment' to its enrollment and racial balance 'targets'"; and 2) "the plan's ability to remedy the racial disparities in dropouts, suspensions, attendance, assignments to special education classes, test scores, and matriculation to college." *Coalition to Save Our Children v. Board of Education,* 757 F.Supp. 328, 336 (D.Del.1991). In ultimately approving the "CHOICE" plan, the court noted the following in connection with the goal of unitary status:

> **While federal court supervision of local school systems in desegregation cases was always intended as a temporary measure,** the court's desegregation decrees and its supervision operate until the court finds that the school board has complied with the desegregation orders in good faith, is unlikely to return to the segregative practices employed by its predecessor, and that "the vestiges of past discrimination had been eliminated to the extent practicable." ... In order words, the court must make a finding that the district is currently and will continue to be operated in compliance with the commands of the Equal Protection Clause of the fourteenth amendment....

[M]inority students in the Red Clay District have yet to achieve a full measure of equality. **While technically maintaining a 9–3 feeder pattern,** the Red Clay Board has knowingly allowed schools which are clearly perceived as "minority" and "non-minority" schools to exist within the District for at least six years. Moreover, the Board has failed for many years to address the secondary effects of the racial imbalances in its feeder patterns, including a large number of racially disproportionate classrooms, low minority achievement scores and college matriculation, etc....

**18.** By comparison, the court noted, and plaintiff acknowledged, that the other three school districts in the desegregation area had complied with the spirit of the court's order in such a way

With all of this in mind, the court cannot and will not make a finding that the Red Clay District is currently operating in compliance with the Equal Protection Clause ...[18]

*Id.* at 349, 350 (emphasis added).

The Supreme Court issued its decision in *Board of Education v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), just weeks before the district court opinion above issued. In *Dowell,* the district court had found that "unitariness had been achieved" by the School Board of Oklahoma City Public Schools and that, therefore, court-ordered desegregation must end. *Id.* at 243, 111 S.Ct. at 634. The United States Court of Appeals for the Tenth Circuit reversed, holding that "an injunction takes on a life of its own and becomes an edict quite independent of the law it is meant to effectuate." 890 F.2d 1483 (10th Cir.1989) at 1490. According to the Tenth Circuit, despite a finding of unitary status, the local school authorities would continue to be enjoined consistent with the desegregation decree; e.g., the pupil assignment plan would remain in effect indefinitely until such time, if ever, the school authorities could demonstrate "'dramatic changes in conditions unforeseen at the time of the decree that ... impose extreme and unexpectedly oppressive hardships on the obligor.'" *Id.*

The Supreme Court reversed, noting at the outset that "federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." 498 U.S. at 247, 111 S.Ct. at 637. The Court went on to reaffirm that

> [l]ocal control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs.... Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates

as "to be making progress toward operating in compliance with the Equal Protection Clause." *Id.* at 349.

that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination...."

*Id.* at 248, 111 S.Ct. at 637 (citations omitted).

As to the standards to be used to judge whether in fact the "effects of past intentional discrimination" have been remedied, the Court observed that the term "unitary" had no precise definition, but that "a school board [was] entitled to a rather precise statement of its obligations under a desegregation decree." *Id.* at 245, 246, 111 S.Ct. at 635, 636. In determining whether the vestiges of *de jure* segregation have been eliminated as far as practicable, the Court informed the district court to look "not only at student assignments, but 'to every facet of school operations—faculty, staff, transportation, extracurricular activities, and facilities.'" *Id.* at 250, 111 S.Ct. at 638, *citing Green*, 391 U.S. at 435, 88 S.Ct. at 1693. The case was remanded for that purpose.

A year later, the Supreme Court revisited the desegregation arena in *Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). The Court observed that, because " 'local autonomy of school districts is a vital national tradition,'" "federal judicial supervision of local school systems was intended as a 'temporary measure.'" *Id.* at 489, 490, 112 S.Ct. at 1445. The Court endorsed the "concept of unitariness" as "convey[ing] the central idea that a school district that was once a dual system must be examined in all of its facets, both when a remedy is ordered and in the later phases of desegregation when the question is whether the district courts' remedial control ought to be modified, lessened, or withdrawn." [19] *Id.* at 486, 112 S.Ct. at 1443. Nevertheless, the Court cautioned that the term "unitary" was not a "precise concept" and instead focused its analysis on "the school system's record of compliance." [20] *Id.*

at 487, 491, 112 S.Ct. at 1443, 1446. *See also id.* at 498, 112 S.Ct. at 1449–50. ("A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future."). In further explanation of what supervising courts should consider in determining whether to withdraw judicial oversight, the Court observed that

[i]n one sense of the term, vestiges of past segregation by state decree do remain in our society and in our schools. Past wrongs to the black race, wrongs committed by the State and in its name, are a stubborn fact of history. And stubborn facts of history linger and persist. But though we cannot escape our history, neither must we overstate its consequences in fixing legal responsibilities. The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied. It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a *de jure* violation. And the law need not proceed on that premise.

As the *de jure* violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system. The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith.

*Id.* at 495–96, 112 S.Ct. at 1448.

In its latest pronouncement on the issue of school desegregation, the Supreme Court re-

---

**19.** The district court had declared that the defendant, DeKalb County, Georgia, School System, was a unitary system with regard to student assignments, transportation, physical facilities, and extracurricular activities, but that vestiges of the dual system remained in the areas of teacher and principal assignments, resource allocation, and quality of education. *Id.* at 473–75, 112 S.Ct. at 1437.

**20.** In addition to compliance with the desegregation decree, the Court directed that supervising courts determine whether continued federal control would be necessary or practicable to achieve compliance, and whether the defendant had demonstrated a good faith commitment to the whole of the decree and the underlying constitutional mandates. *Id.* at 491, 112 S.Ct. at 1445–46.

iterated the maxim that " 'federal supervision of local school systems was intended as a temporary measure to remedy past discrimination.' " *Missouri v. Jenkins,* —— U.S. ——, ——, 115 S.Ct. 2038, 2049, 132 L.Ed.2d 63 (1995), *citing Dowell,* 498 U.S. at 247, 111 S.Ct. at 637. The Court reiterated as well the standard of review articulated in *Freeman,* 503 U.S. at 491–92, 112 S.Ct. at 1445–46, that is, that the "ultimate inquiry is 'whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.' " —— U.S. at ——, 115 S.Ct. at 2049.

The two primary issues under examination in *Jenkins* were the existence of racially identifiable schools (with a population of over 90% black students) and a system-wide reduction in student achievement. With respect to the former issue, the Court observed that it long ago rejected the suggestion " 'that schools which have a majority of Negro students are not "desegregated" whatever the racial makeup of the school district's population and however neutrally the district lines have been drawn and administered.' ... '[T]he Court has consistently held that the Constitution is not violated by racial imbalance in the schools, without more ....' " *Id.* at ——, 115 S.Ct. at 2050, *citing Milliken,* 418 U.S. at 747 n. 22, 94 S.Ct. at 3128 n. 22 and 433 U.S. 267, 280 n. 14, 97 S.Ct. 2749, 2757 n. 14, 53 L.Ed.2d 745 (1977).

In *Jenkins,* the district court had found only an intradistrict violation, thus precluding the mandatory interdistrict redistribution of students to remedy racially imbalanced schools. The district court's remedy instead focused on "desegregative attractiveness," coupled with "suburban comparability." —— U.S. at ——, 115 S.Ct. at 2050. As described by the Court, "[t]his remedy has included an elaborate program of capital improvements, course enrichment, and extracurricular enhancement" and has been characterized as the "most ambitious and expensive remedial program in the history of school desegregation." *Id.* at ——, ——, 115 S.Ct. at 2044, 2051.

The Court, however, rejected "desegregative attractiveness" as a standard by which to judge the defendant's progress toward unitary status.

The District Court's pursuit of "desegregative attractiveness" cannot be reconciled with our cases placing limitations on a district court's remedial authority. It is certainly theoretically possible that the greater the expenditure per pupil within the KCMSD,[21] the more likely it is that some unknowable number of nonminority students not presently attending schools in the KCMSD will choose to enroll in those schools.... But this rationale is not susceptible to any objective limitation....

Nor are there limits to the duration of the District Court's involvement. The expenditures per pupil in the KCMSD currently far exceed those in the neighboring [suburban school districts].... Sixteen years after this litigation began, the District Court recognized that the KCMSD has yet to offer a viable method of financing the "wonderful school system being built." ... Each additional program ordered by the District Court—and financed by the State—to increase the "desegregative attractiveness" of the school district makes the KCMSD more and more dependent on additional funding from the State; in turn, the greater the KCMSD's dependence on state funding, the greater its reliance on continued supervision by the District Court. **But our cases recognize that local autonomy of school districts is a vital national tradition, ... and that a district court must strive to restore state and local authorities to the control of a school system operating in compliance with the Constitution.**

*Id.* at ——, 115 S.Ct. at 2054 (emphasis added) (citations omitted).

Likewise, the standard employed by the district court to gauge student achievement was rejected. Significantly, the district court in *Jenkins* specifically had determined in its initial remedial order that "[s]egregation ha[d] caused a system-wide reduction in student achievement in the schools...." *Id.* at

---

**21.** The Kansas City, Missouri, School District.

——, 115 S.Ct. at 2042. Upon its latest review, the district court ordered continued funding of various "quality education programs," reasoning that the school district "had not reached anywhere close to its 'maximum potential because the District is still at or below national norms at many grade levels.'" *Id.* at ——, 115 S.Ct. at 2055.

But this clearly is not the appropriate test to be applied in deciding whether a previously segregated district has achieved partially unitary status.... The basic task of the District Court is to decide whether the reduction in achievement by minority students attributable to prior *de jure* segregation has been remedied to the extent practicable. Under our precedents, the State and the KCMSD are "entitled to a rather precise statement of [their] obligations under a desegregation decree." ... Although the District Court has determined that "[s]egregation has caused a system-wide reduction in achievement in the schools of the KCMSD," ... it never has identified the incremental effect that segregation has had on minority student achievement or the specific goals of the quality education programs....

In reconsidering this order, ... the District Court ... should consider that the State's role with respect to the quality education programs has been limited to the funding, not the implementation, of those programs. As all the parties agree that improved achievement on test scores is not necessarily required for the State to achieve partial unitary status as to the quality education programs, the District Court should sharply limit, if not dispense with, its reliance on this factor.... **Just as demographic changes independent of *de jure* segregation will affect the racial composition of student assignments, ... so too will numerous external factors beyond the control of the KCMSD and the State affect minority student achievement. So long as these external factors are not the result of segregation, they do not figure in the remedial calculus....** Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day

when the KCMSD will be able to operate on its own.

*Id.* at —— – ——, 115 S.Ct. at 2055–56 (emphasis added) (citations omitted).

## III. FINDINGS OF FACT

### A. The *Green* Factors

1. As articulated above, the Supreme Court in *Green* identified various facets of a school system which should be examined for vestiges of *de jure* segregation: student assignment, faculty and staff assignment, transportation, extracurricular activities, and facilities. 391 U.S. at 435, 88 S.Ct. at 1693.

2. Plaintiff concedes that federal supervision should be withdrawn in the areas of transportation and facilities. (D.I. 1936 at 720–22)

#### Student Assignment—Schools

3. Dr. Christine Rossell, a defense expert, utilized several different methods in analyzing the school districts and their respective racial imbalances. The first and most common method used by social scientists is the Index of Dissimilarity, which indicates how races in a school district are distributed across schools. The measure varies from "0", representing perfect racial balance, to "1", representing complete racial imbalance. The resulting figure represents the proportion of black students who would have to be reassigned to white schools, if no whites were reassigned, in order to have the same proportion in each school as in the district as a whole. (DX 271 at 5–6, n. 3)

4. Prior to the 1978 order, schools in the then 11 school districts, when compared with the racial composition of all of New Castle County, were very imbalanced. (DX 271 at 7, Fig. 1)

5. After implementation of the 1978 order, the indicia of racial dissimilarity decreased significantly to less than .2, regarded by Dr. Rossell as "close to perfect racial balance." (D.I. 1935 at 407–411; DX 271 at 7–8, Fig. 2; DX 292)

6. In the years that followed the 1978 order, the level of racial imbalance fluctuated. Red Clay peaked with over a .2 ratio of racial imbalance and Colonial had the most

perfect racial balance of approximately .05 between 1983 and 1986. (DX 271 at Fig. 2; DX 292)

7. Dr. Rossell compared these figures with 76 other school districts which she determined to be similar to the school districts of New Castle County in size, racial composition, and having a court-ordered desegregation plan. (DX 271 at 7) In doing said comparison, she included bilingual and special education programs because they were contained in the national sample. (*Id.* at 8, n. 6)

8. Dr. Rossell concluded that the school districts in New Castle County "are significantly less racially imbalanced than the national court ordered sample." (*Id.* at 8)

9. Dr. Rossell also analyzed the percentage of students in schools in the 4 school districts within ± 10% of minority percentages for the entire district ("± 10% district minority percentage"). In doing so, she included black and Hispanic students under the heading "minority." She also performed the calculation of ± 10, 15 and 20% at the "grade group level." Therefore, each school was compared to the percentage minority for its grade grouping, e.g., elementary school, middle school, or high school. These figures exclude special education. (*Id.* at 8, n. 7–8, Fig. 3)

10. Since the 1978 order, over 80% of students in the Brandywine, Christina, and Colonial school districts have attended schools within ± 10% of the district minority percentage. (*Id.* at 9, Fig. 3; DX 293)

11. Red Clay did not reach that level until 1992. Between 1978 and 1992 less than 80% but more than 60% of the students attended such a school. (*Id.*)

12. Since the 1978 order, over 90% of students in the Brandywine, Christina, and Colonial school districts have attended schools within ± 15% of the district minority percentage. (*Id.,* Fig. 4; DX 294)

13. Red Clay did not reach that level until 1992. Between 1978 and 1992 less than 90% but more than 80% of the students attended such a school. (*Id.*)

14. Since the mid–1980s, the most common standard used in desegregation cases is a ± 20% of the percentage minority. Since the 1978 order, nearly 100% of students in the Brandywine, Christina, and Colonial school districts have attended schools within ± 20% of the district minority percentage. (D.I. 1935 at 416–418; DX 271 at 10, Fig. 5; DX 295)

15. While Red Clay did not reach that level until 1992, between 1978 and 1992 more than 90% of the students attended such a school. (*Id.*)

16. The next analysis offered by Dr. Rossell was a determination of the percentage of schools, as opposed to the percentage of students, which have operated within a ± 10% standard. Dr. Rossell performed this analysis excluding special schools. (D.I. 271 at 10, Fig. 6, n.a)

17. In 1993, between 86% and 94% of the schools in the 4 districts were currently within a ± 10% district minority percentage. (D.I. 271 at 10; DX 296)

18. More than 80% of the schools in Brandywine, Christina, and Colonial have met this standard since 1982. (D.I. 271 at 10, Fig. 6)

19. Red Clay did not reach that level until 1992. Between 1982 and 1992 less than 80% but more than 60% of its schools operated within a ± 10% of the district minority. (*Id.*)

20. The final analysis offered by Dr. Rossell was identical to the above, with one exception. Instead of utilizing the "grade grouping" method, Dr. Rossell used the "grade span" method which compares a school to the grades within the district encompassed by that school (i.e., instead of comparing a middle school with other middle schools, she compared a middle school of grades 6–8 with grades 6–8). This is the standard currently used by New Castle County for planning. (DX 271 at 11)

21. Using this standard, 95% of the schools in New Castle County are currently within a ± 10% district minority percentage, and since 1981, they have always been 85% or more. (*Id.,* Fig. 7)

22. Although the court has never mandated a standard of review, Dr. David J. Armor, another defense expert, computed his figures using a ± 10% variance, computing separately by grade spans of elementary, middle, and high schools.[22] Dr. Armor included both black and Hispanic students in his computations concerning "minorities" and excluded from all computation "self contained special education" schools. (D.I. 1936 at 738–740; DX 273 at 5–6)

23. Dr. Armor's analysis was illustrated as follows: the x axis shows the years from 1981 (the year in which the 4 districts were formed) through 1993 (1994 data was not available at the time of his analysis); the y axis shows percentage of black and Hispanic enrollment; two solid lines define ± 10% limits, school by school. (D.I. 1936 at 742–44)[23]

### Brandywine School District

a. All the Brandywine elementary schools stayed within the ± 10% district minority percentage from 1981 through 1993. (D.I. 1936 at 745; DX 273 at 7, Fig. I–1 through I–3)

b. All the Brandywine middle schools stayed within the ± 10% district minority percentage from 1981 through 1993 with the exception of Burnett Middle School, which was converted to an elementary school in 1990. (D.I. 1936 at 746; DX 273 at 7, Fig. I–4)

c. The only Brandywine high school to fall outside the variance was Claymont High School, which has since been closed. (D.I. 1936 at 746; DX 273 at 7, Fig. I–5)

### Christina School District

a. There are 18 Christina elementary schools. With 4 exceptions, all these schools have fallen within the ± 10% variance for the last 13 years. (DX 273 at 9, Fig. I–12 through I–16) Of these 4, 2 of the schools (Downes and Maclary) fell out of the variance only slightly and only for 1 year. (DX 273, Fig. I–12, I–13) Maclary is now closed. The Pulaski Elementary School was increasingly above the ± 10% variance from 1986 through 1989; zone adjustments brought it within the variance in 1990. (Id. at 10) The Smith Elementary School was above the ± 10% variance in 1991 and 1992; zone adjustments, including the opening of a new school (Marshall) in 1993, brought this school back within the ± 10% variance. (Id.; D.I. 1936 at 758–59)

b. All the Christina middle schools have been within the ± 10% variance since 1981. (D.I. 1936 at 759; DX 273 at 10, Fig. I–17)

c. All the Christina high schools have been within the ± 10% variance since 1981. (D.I. 1936 at 759; DX 273 at 10, Fig.I–18)

### Colonial School District

a. There are 10 Colonial elementary schools. All but 2 have been within the ± 10% variance since 1983.[24] (DX 273, Fig. I–19 through I–21) Carrie Downes and Delaware City were outside the variance 2 and 3 years respectively, but have remained within the ± 10% variance since 1988. (Id., Fig. I–19)

b. All of the Colonial middle schools have been within the ± 10% variance since 1981. (D.I. 1936 at 760–61; DX 273 at 11, Fig. I–22)

c. There is only 1 Colonial high school, which is, by definition, racially balanced. (Id.)

22. A ± 10% standard was used in several cases in the 1970's. (Id. at 740) Starting in the late 1970's and throughout the 1980's, the most common standard of review encountered was ± 15%. (Id.) Starting in late 1980's and early 1990's, ± 20% began to be used. (Id.)

23. By his analysis, Dr. Armor notes that a) the plan as implemented in 1982 was designed by the State's Data Service Center ("DSC") working under the supervision of the court, so any early variations should not be attributed to the school districts; and b) when the initial plan was enacted, students already attending certain schools had the option to be grandfathered into that school's attendance, thus escaping the feeder pattern. Consequently, the full effect of reassignment was not felt for up to three years. Id. at 755–56.

24. Commodore MacDonough has experienced significant racial imbalance, but is exempt from the plan because of its distance from black population centers. (D.I.1936 at 759–60; DX 273 at 10)

### Red Clay School District

a. 3 Red Clay elementary schools fell out of balance during the 1980's, due to demographic changes (in the case of Richardson Park and Baltz) and the presence of the bilingual education program in the Lewis School. (D.I. 1936 at 748–750; DX 273 at 8, Fig. I–6 through I–8)

b. In 1991, Red Clay instituted a new feeder pattern which brought all the formerly imbalanced elementary schools within the ± 10% district minority percentage. 1 elementary school was opened in 1991 and fell outside the variance for just 1 year. The Lewis School, still the center for bilingual education, fell outside the ± 10% variance in 1993. (D.I. 1936 at 749–751)

c. Of the 5 Red Clay middle schools, the Conrad Middle School fell outside the ± 10% variance from 1986 through 1990. The H.B. duPont Middle School fell outside the ± 10% variance from 1984 through 1990. (DX 273, Fig. I–9, I–10) Dr. Armor attributes the increase in the Conrad Middle School to the same demographic shift that affected Baltz, i.e., a sudden large increase in the minority population in that area. (D.I. 1936 at 752) Since the reconfiguration of the feeder patterns in 1991, both schools have been within the ± 10% variance. (*Id.*)

d. 2 of the 4 Red Clay high schools have remained within the ± 10% variance since 1981. (DX 273, Fig. I–11)

e. The A.I. duPont High School was below the ± 10% variance from 1983 to 1990, with the exception of 1988. (*Id.*)

f. Wilmington High School has been within the ± 10% variance only since 1993.[25] (*Id.*)

### The Four Districts

24. Review of the overall racial balance of the 4 school districts demonstrates that for 8 of 13 years, 80% or more of the schools met

the ± 10% variance. (D.I. 1936 at 762; DX 273, Fig. I–23) Specifically, 90% of the schools in Brandywine, Colonial, and Christina have met this variance for 10 or more years. For Red Clay, 80% have met the ± 10% variance for 8 of the 13 years. (DX 273 at 11)

25. From 1987 through 1991, just less than 70% of Red Clay's schools met this standard. (DX 273, Fig. I–23)

26. If a ± 20% standard is used, only 2 schools would fall outside—Wilmington High School (from 1985–1990) and Lewis Elementary School, both in the Red Clay Consolidated School District. (D.I. 1936 at 762–63; DX 273 at 12)

27. Dr. Leonard Stevens, plaintiff's expert, concedes that with respect to "traditional" schools,[26] Brandywine, Christina, and Colonial have complied with the ± 10% standard and "attained building enrollments that are not racially identifiable ... [and] sustained them over a period of time." (D.I. 1941 at 2472, 2488–89; PX 2166, 2167)

28. Dr. Stevens concedes as well that no federal court has adopted a ± 10% standard in a unitary status hearing, nor has Dr. Stevens ever before testified in a unitary status hearing in support of such a standard. (D.I. 1941 at 2507–2508)

29. The 4 districts are among the most racially balanced schools in the United States. (D.I. 1936 at 764–67; DX 271 at 11; DX 273 at 12)

### Student Assignment—Classrooms

30. The court-ordered reports reflect the percentage of children in classrooms which are 10–49% minority. (*See, e.g.,* D.I. 1879)

31. Excluding special education and bilingual classes in the 1993–94 school year, an average of 80% of the students in the 4 districts attended classes which were 10–49% minority. Red Clay high schools had the

---

**25.** The projected attendance for Wilmington High School in 1981 was within the variance, but a combination of sudden losses of white students and an increase in the black student population caused an initial imbalance.

**26.** With respect to "special" schools, the 1978 order exempted the following: "Subject to the requirements of State and Federal law, students presently attending and who in the future may attend the Bush, Douglass, Leach, Meadowood, Opportunity, Shortlidge (orthopedic wing only), Sterck and Wallin special education school facilities and such other similar special school facilities as presently exist or may be hereafter established in the New District." (D.I. 699 at 11)

lowest percentage of students in such classrooms, only 62%. Christina elementary schools had the highest percentage at 94%. (D.I. 1935 at 423; DX 271 at 12, Fig. 8)

32. Excluding special education and bilingual classes in the 1993–94 school year, an average of 85% of the students in the 4 districts attended classes that were within ± 20% of their schools' percentage minority. Red Clay high schools had the lowest percentage with 64%. Colonial elementary schools had the highest, at 97%. (D.I. 1935 at 425; DX 271 at 13, Fig. 9)

33. Using a "standardized exposure measure" to calculate classroom imbalance, classroom imbalance in the 4 districts was found to be ⅓ to ½ of the imbalance in a national sample of schools collected by the Office of Civil Rights in the United States Department of Education. (D.I. 1935 at 426–430; D.I. 1937 at 970–71; DX 271 at 16)

34. Although not articulated in this fashion by the experts, it is evident from the record that the "classroom imbalance" issue of concern to plaintiff is that ostensibly created by "tracking" or "ability grouping."

35. There is substantial dispute among educators as to the meaning and effect of these terms. There can be no dispute that traditionally children have been assigned to various instructional groups on the basis of ability. The question, whether posed as one of "tracking" or "ability grouping," is whether such assignments are accomplished on the basis of race or for the purpose of racial segregation.

36. The extent to which elementary and middle school students are placed in classes according to their ability is unclear from the record. (See PX 2252 at 13–20)

37. The record indicates that, for the period 1989–1994, minority children (blacks and Hispanics) in grades K–8 represented approximately 7–8% of those children (versus a participation rate of approximately 85% for white children) given the opportunity to participate in accelerated educational programs, admission to which is based on parental or faculty nomination and test scores. (D.I. 1945 at 3639; PX 2252 at 22–23, 32)

38. In 1993, the percentage of minorities in the self-contained honors and gifted student program at Burnett Elementary School[27] who scored above 85% on exams is slightly greater than that for the other groups. (D.I. 1935 at 435; DX 271 at 21, Fig. 12)

39. Class selection in high school is done through a process which involves class presentations by guidance counselors, booklets with course descriptions, application by students in consultation with family, individual guidance from guidance counselors, and teacher input. (D.I. 1937 at 1148–53 and 1211–14; D.I. 1938 at 1527–38; D.I. 1939 at 1572–82)

40. Students may change levels during the school year. In Brandywine and Christina, where there has been a teacher recommendation, students and their families have the option of requesting a change in that level through a course change process. (D.I. 1938 at 1535; D.I. 1939 at 1583) At least in a number of schools, there is a waiver form which must be executed by the family if they request a placement that is not the one recommended by the school. The parents and student have the ultimate say in the level to which the student is assigned.[28] (D.I. 1945 at 3642–43)

41. Minority students are not treated differently from nonminority students in the course selection process. (D.I. 1938 at 1537; see also D.I. 1937 at 1150; D.I. 1938 at 1527–38; D.I. 1939 at 1572–82)

42. Different levels of instruction are offered to students in academic subjects in the high schools of all 4 districts. (D.I. 1944 at 20; D.I. 1945 at 3597)

43. In the spring of 1994, less than 10% of all students (with the exception of Asian

27. This program is the only self-contained "gifted" student program in the 4 districts. (D.I. 1935 at 435)

28. Plaintiff's expert, Dr. Jeannie Oakes, opined that the course selection process described above is not really a matter of choice because parents who are uncomfortable with the "system," usually minorities, are least likely to challenge a school's recommendation. (D.I.1945 at 3644)

students in Brandywine and Red Clay) who were enrolled in at least one honors or advanced placement course were enrolled in all honors or advanced placement courses. (D.I. 1935 at 439)

44. In the spring of 1994, less than 30% of all students (with the exception of Asian students) had been enrolled in honors or advanced placement courses in the same subject(s) throughout their high school career. (D.I. 1935 at 441; DX 271, Fig. 15) In each school district, however, more white than minority students had been kept at the same "honors" level throughout high school.[29]

45. a. Approximately 81% of students in non-college prep English classes are also in non-college prep math classes. Approximately 80% of students in college prep English are also in college prep math. (D.I. 1945 at 3600–01; PX 2252 at 60; PX 2262)

b. Approximately 81% of students in non-college prep math classes are also in non-college prep science classes. Approximately 79% of students in college prep math are also in college prep science. (PX 2252 at 61; PX 2262)

c. More than 80% of students in non-college prep social studies classes are also in non-college prep science classes. More than 80% of students in college prep social studies are also in college prep science. (PX 2252 at 62; PX 2262)

d. More than 90% of students not in honors classes in social studies are not in honors classes in science. Less than 80% of students who are in advanced social studies are also in advanced science. (D.I. 1945 at 3602; PX 2252 at 65; PX 2263)

e. More than 90% of students not in honors classes in social studies are not in honors classes in English. Less that 80% of students who are in advanced social studies are also in advanced English. (PX 2252 at 64; PX 2263)

f. More than 80% of students not in honors classes in science are not in honors classes in math. Less than 60% of students who are in advanced science are also in advanced math. (PX 2252 at 64; PX 2263)

46. A review of the percentages of the racial groups who were taking college and non-college prep classes illustrates that: a) a little over 50% of Brandywine's black students in grades 9–12 were taking non-college prep English, whereas a little less than 20% of Brandywine's white students were taking that level of English; b) a little over 60% of Christina's black students in grades 9–12 were taking non-college prep English, whereas a little less than 25% of Christina's white students were taking that level of English; c) a little over 50% of Colonial's black students in grades 9–12 were taking non-college prep English, whereas a little less than 35% of Colonial's white students were taking that level of English; d) a little over 40% of Red Clay's black students in grades 9–12 were taking non-college prep English, whereas a little less than 17% of Red Clay's white students were taking that level of English. (PX 2255) Less than 5% of black students were enrolled in advanced English in the high schools of the 4 districts; however, over 20% of white students were at that level. (PX 2256)

47. There is evidence that among high school students who achieve identical testing scores,[30] black students were more likely to be placed in the lower level class than were white students. (D.I. 1945 at 3652–54; PX 2252 at 48; PX 2261A)

48. On the other hand, the percentage of minorities enrolled in honors and AP classes who scored over the 75th percentile in reading or math in the spring of 1993 is slightly greater than that of whites in all 4 school districts. (DX 271, Fig. 13)

49. There is evidence that lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college. (PX 2262 at 82; PX 2265)

---

29. 12% more whites in Colonial, 4% at Christina, 8% at Red Clay and Brandywine. (DX 271, Fig. 15)

30. The comparison apparently does not include academic achievement as measured by course performance, or whether such placement was requested or required.

### Faculty and Staff Assignment

50.  The staff is divided into three subsections: administrative staff, certificated staff, and classified staff.

51.  "Administrative staff" includes district office administrators, such as superintendents, directors, supervisors and school principals. Plaintiff and defendants agree that no racial identifiability exists with respect to administrative staff. (D.I. 1936 at 792; 1941 at 2534; PX 2160 at 14–15)

52.  "Certificated staff" includes nonadministrative certificated personnel such as teachers, psychologists, speech and hearing therapists, educational diagnosticians and other "instructional and pupil support personnel." (D.I. 1935 at 545)

53.  "Classified staff" includes bus drivers, bus aides, secretarial and clerical positions, paraprofessionals, custodial employees, and food service workers. (D.I. 1935 at 551)

### Brandywine School District

54.  Brandywine monitors the racial balance of its teaching staffs, attempting to have the racial balance of the faculty mirror that of the district. (D.I. 1936 at 605–606)

55.  With respect to teachers, at times Brandywine will unassign teachers with less seniority than others in favor a keeping a racial balance. Additionally, voluntary transfers are disallowed when such a transfer will result in a racial imbalance. Finally, Brandywine attempts to place new hires in schools which need to adjust their racial balance. (*Id.* at 606–07)

56.  Since 1989, Brandywine has had an affirmative action program. In 1991, an Affirmative Action Committee was formed which includes people from the community to look at recruitment of minority teachers. This recruitment encompasses visits to historically black colleges and recruiting seminars in major American cities. (*Id.* at 609–610)

57.  The goals of the Affirmative Action Committee were to have 17% minority hiring in 1992 and 1993, and 20% minority hiring in 1994. (*Id.* at 611–13) Brandywine had a 10.3% minority hiring in fiscal year 1992, a 13.4% minority hiring in fiscal year 1993, and a 15.4% minority hiring in fiscal year 1994. (DX 239)

58.  The percentage of minority teachers in Brandywine has declined from 16% in 1981 to 13–13.5% in 1993. (D.I. 1936 at 615)

59.  In trying to expand the pool of potential hires, Brandywine recruits not only teachers who have received a degree in education from a 4–year program, but teachers who have received their B.A. or B.S. degrees in fields other than education, and perhaps have prior teaching experience. (D.I. 1936 at 619)

60.  With respect to classified personnel, Brandywine recruits through community channels. Brandywine has chosen not to reassign classified staff in order to have a racially balanced staff that works at each school, because these employees make very low wages and the negative impact on them far outweighs the negligible, if any, effect on having racially unidentifiable schools (D.I. 1936 at 614–615)

61.  Of all the schools in Brandywine, only 4 have fallen outside a ± 10% variance in thirteen years. When such an incident has occurred, it was often limited in scope and brief in time. (*Id.* at 776–777; DX 273, Fig. II–1 through II–6)

### Christina School District

62.  With respect to certificated staff, Christina monitors the racial percentage of such staff continuously. (D.I. 1935 at 544–545) It does so by recruitment, limiting voluntary transfers and, in certain situations, utilizing race over seniority in the reassignment of teachers. (D.I. 1935 at 545–46)

63.  Christina has attempted to recruit minority teachers by sending announcements to predominantly and historically black universities, attending career days in predominantly black universities, and hiring minorities as paraprofessionals. (*Id.* at 547)

64.  In fiscal year 1992, Christina hired 39 minority teachers, which constituted 19.1% of the new hires for that year. In fiscal year 1993, Christina hired 18 minority teachers, which constituted 14.2% of the new hires. In fiscal year 1994, Christina hired 15 minority

teachers, which constituted 13.9% of the new hires. (DX 239)

65. In fiscal year 1992, Christina recruited a greater percentage of minority teachers than the percentage of minority graduates in education in Delaware, Maryland, New Jersey and Pennsylvania. (DX 306; D.I. 1935 at 550)

66. Nonetheless, there has been a decrease in the percentage of black teachers in Christina since 1982. (D.I. 1935 at 561–62).

67. 6 of the schools in Christina have fallen outside of a ± 10% district minority percentage since 1981, but none seemingly developing any pattern. (D.I.1936 at 783–785; DX 273, II–14 through II–20)

68. With respect to Christina's classified staff, they are recruited through community newsletters and "word of mouth through the community." (D.I.1935 at 548)

69. Christina has chosen not to reassign classified staff in order to have a racially balanced staff that works at each school, because these employees make very low wages and the negative impact on them far outweighs the negligible, if any, effect on having racially unidentifiable schools. (*Id.* at 552)

70. Bus drivers and bus aides work out of a bus yard and, therefore, would not impact whether a school is racially identifiable. Similarly, members of the maintenance crew work out of one location and are not assigned to a specific school. The bulk of the custodial staff works after school is released for the day and, therefore, has limited contact with students in school. (*Id.* at 554–555)

71. There has been a decrease in black transportation workers in Christina since 1982. (*Id.* at 562)

72. Food service workers earn approximately $3200–$4300 per year, working approximately three hours a day. Generally, these employees work close to where they live. Transferring them to a place where they would have to drive or commute long distances is not feasible for the salary which they are receiving. (*Id.* at 556–57) The negative economic impact for secretarial and clerical personnel is similar to that of food service workers. (*Id.* at 557–58)

73. Christina has never received a complaint with respect to its decision not to reassign classified staff. (*Id.* at 553)

## Colonial School District

74. Colonial makes a concerted effort to hire minority teachers. Those efforts include recruiting from minority colleges. (D.I.1936 at 662–63)

75. In fiscal year 1992, Colonial hired 15 minority teachers, comprising 15% of the new faculty hires that year. In fiscal year 1993, Colonial hired 7 minority teachers, comprising 13.2% of the new hires. In fiscal year 1994, Colonial hired 7 minority teachers, comprising 11.5% of the new hires. (DX 239)

76. Approximately 15–16% of Colonial's teachers are black. (D.I.1936 at 682)

77. In July 1989, a task force was assembled to address, *inter alia*, minority faculty representation. The Coalition were invited to participate, but declined. (*Id.* at 664)

78. After one year, the task force reported. All but one of its recommendations were implemented. (*Id.* at 664–65)

79. Colonial encounters the same obstacles to reassignment of classified staff as the other districts. Many of the classified staff positions are part time and low salaried. There is no means of public transportation in the southern part of the district. Elsewhere in the district, where public transportation is available, "a number of transfers" are required. (*Id.* at 671)

80. Prior to "the last year or two," when the Coalition raised it, Colonial had "heard no complaints" concerning the deployment or racial composition of classified staff. (*Id.* at 716)

81. All classified staff members have a right to seek voluntary transfer between buildings. (*Id.* at 717)

82. In the 1993–94 school year, fewer than 12 such requests were received. As of 12/21/94, fewer than 5 had been received during the 1994–95 school year. (*Id.* at 719) The district has never "declined to grant voluntary transfer requests submitted by

classified staff in situations where granting the request would improve the racial balance in a given school." (*Id.* at 720)

83. Of all the schools in Colonial, 5 have fallen outside a ± 10% variance in 13 years. (D.I.1936 at 787–789) While some of these variations were for several years, many of these schools are quite small, such that the reassignment of one minority teacher would bring them within the variance. (*Id.* at 788)

### Red Clay Consolidated School District

84. To maintain faculty racial balance, Red Clay (1) when downsizing, will "unassign" a majority teacher before a less senior minority teacher; (2) when positions become available, will "focus-recruit" minority teachers to voluntarily transfer to those positions, or hold a position open until a minority can be recruited to fill it. (*Id.* at 625–26)

85. In 1991–92, Red Clay lost 180 teachers due to the exercise of early retirement options. (*Id.* at 633)

86. In fiscal year 1992, Red Clay hired 27 minority (i.e., black and Hispanic) teachers, constituting 16.3% of new hires for that year. In fiscal year 1993, Red Clay hired 14 minority teachers, constituting 19% of new hires. In fiscal year 1994, Red Clay hired 6 minority teachers, constituting 10.9% of new hires. (DX 239)

87. Approximately 17 percent of Red Clay's teaching staff is minority. (*Id.* at 627)

88. There has been a decrease in the percentage of black teachers in Red Clay since 1982. (D.I.1936 at 645–46)

89. Of all the schools in Red Clay, 8 have fallen outside a ± 10% variance in 13 years. However, 2 of these schools are the centers for bilingual education with numerous Hispanic teachers. If the Hispanic teachers were excluded from the analysis, then these schools would fall within a ± 10% district minority percentage. (D.I.1936 at 780–781) The Highlands School was outside a ± 10% variance for several years. (*Id.* at 779–783; DX 273, Fig. II–7 through II–12)

### The Four Districts

90. Approximately 80% of the schools in the 4 districts have fallen within a ± 10% variance every year. With the exception of 1981, over 90% of the schools have fallen within a ± 15% variance. (*Id.* at 790; DX 273, Fig. II–27, I–28)

### Extracurricular Activities

91. The Delaware Secondary School Athletic Association ("DSSAA") guidelines describe the state's requirements for participation in athletics. (D.I.1937 at 1088; DX 261) As underclassmen, students must be passing four credits, two of which must be in a major subject area. Seniors must be passing all their courses necessary for graduation. (DX 261 at 28)

### Brandywine School District

92. All extracurricular activities are open to all students in Brandywine. (D.I.1937 at 1139)

93. Participation is by self-selection. (*Id.*)

94. Brandywine invites eighth graders and their parents to the high schools and gives them an opportunity to speak with representatives from the extracurricular activities. (*Id.* at 1139–40)

95. Brandywine takes no steps specifically designed to promote participation of minorities. (*Id.* at 1140)

96. With respect to eligibility, Brandywine follows the DSSAA requirements and requires that a student be taking a full load of classes, passing at least 2 major subjects, and meet all the criteria for graduation. (*Id.* at 1142)

97. Activity busses provide transportation to and from extracurricular activities. (*Id.* at 1142–43)

98. Mount Pleasant High School has approximately 52 extracurricular activities, of which 12 have no minority participants. (DX 267) 1 of these activities has no white participants. (*Id.*)

99. Concord High School has approximately 58 extracurricular activities, 13 of which have no minority participants. (DX 266B)

100. Brandywine High School has 64 extracurricular activities, approximately 19 of which have no minority participants. 2 of

the activities have no white participants. (DX 266A)

### Christina School District

101. Participation in extracurricular activities is based on self-selection. (D.I.1936 at 1085)

102. Christina has a "no-cut" policy in most of its activities. (*Id.* at 1087)

103. Christina announces activities in the newsletters that are sent home. The only method Christina uses to introduce to minorities activities to which they might not have been exposed is through physical education classes. (*Id.* at 1086–87)

104. In addition to the DSSAA guidelines, a student in Christina must maintain a grade point average of 1.75 in order to participate in extracurricular activities. (D.I. 1937 at 1088–90; DX 263)

105. There are no financial barriers to participation in Christina; if uniforms or equipment are needed, the district will provide those for students. (D.I.1937 at 1090)

106. Minority students in Christina are not treated differently from nonminority students with respect to access to or participation in extracurricular activities. (*Id.* at 1090–91)

107. Christina does not cancel an activity if it does not have a racial balance. (*Id.* at 1090–91)

108. There are approximately 103 extracurricular activities offered in Christina. (*Id.*)

109. There are 34 extracurricular activities offered at Christina High School. (DX 267) 2 activities have no minority participants. At least 90% of the participants in 9 activities, including the National Honor Society, are white. 1 activity has no white participants. (DX 266D)

110. At Newark High School, approximately 10 activities have no minority participants. At least 90% of the participants in 12 activities are white. (DX 266F)

### Colonial School District

111. All activities are open to all students in Colonial. (D.I.1937 at 1100)

112. Between 80 and 90 activities are offered at William Penn High school, the only high school in Colonial. (*Id.* at 1101)

113. Participation in extracurricular activities is "strictly" by choice. (*Id.* at 1103)

114. Colonial has in the past gone to the middle schools to encourage students to participate in extracurricular activities when they enter high school. Colonial advertises in the school newspaper and some coaches and sponsors contact individual students. (*Id.* at 1101)

115. In addition to the DSSAA requirements for athletics, Colonial requires that English be passed in order to be eligible for extracurricular activities. (*Id.* at 1103)

116. Colonial provides all the basic needs to participate in an activity, with the exception of athletic footwear. If that is a financial impediment, Colonial, through its boosters' clubs, usually buys shoes. (*Id.* at 1105)

117. Approximately 16% of the staff who are involved in coaching and sponsoring activities are minority. (*Id.* at 1109)

118. Of the approximately 43 extracurricular activities of record at William Penn High School, 4 have no minority participants. 1 organization has no white participants. (DX 266G)

### Red Clay Consolidated School District

119. Extracurricular activities are open to all students in Red Clay and students self-select the activities in which they are interested. (D.I.1936 at 846)

120. The only prerequisites to participation arise in the area of athletics and those outlined by the DSSAA. (*Id.* at 848)

121. Red Clay provides transportation and financial support wherever needed, such as in the area of uniforms. (*Id.* at 849)

122. To increase participation, Red Clay advertises in school, coaches do personal recruiting, and the physical education curriculum is designed to expose students to sports to which they may not have been exposed. (*Id.* at 850)

123. On at least one occasion, Wilmington High School increased the size of an activity

to increase minority participation. (*Id.* at 850–51)

124. Red Clay does not cancel activities because of a failure to have a racial balance. (*Id.* at 852)

125. Dickinson High School has 41 extracurricular activities. (DX 267) Of them, approximately 4 have no minority participants. (DX 266I)

126. Alexis I. duPont High School has 34 extracurricular activities. (DX 267) Of them, 4 have no minority participants. (DX 266H) 1 of them has no white participants. (*Id.*)

127. McKean High School has 35 extracurricular activities, 11 of which have no minority participants. (DX 267; DX 266J)

128. Wilmington High School has 24 extracurricular activities, 3 of which have no minority participants. (DX 267; DX 266K)

### The Four Districts

129. There are no financial or transportation barriers to participation. (D.I.1942 at 2761–63)

130. When a ± 10% variance is used, a substantial number of the districts' extracurricular activities are "racially identifiable." (D.I.1942 at 2662–63; PX 2206, 2207, 2208, 2209)

131. No case has ever embraced a ± 10% variance standard to determine whether unitary status has been achieved on the issue of extracurricular activities. (D.I.1942 at 2765)

### B. Compliance With Ancillary Relief Requirements

132. The 1978 order requires the implementation of eight specific programs ancillary to the pupil assignment plan mandated under the same order, as follows: (1) in-service training; (2) reading and communication skills; (3) curriculum; (4) counseling and guidance; (5) school building construction, site selection and use of existing schools;[31] (6) recognition of human values; (7) standards of conduct; and (8) staff.[32] (D.I. 699 at 11–13)

### In–Service Training

133. Sidney Collison, chair of the team responsible for planning curriculum, instruction and in-service training for the new consolidated school district, drafted a statement dated January 10, 1978 listing management goals for the in-service training of the faculty, staff and administration. (D.I.1940 at 1905–09; DX 12)

134. Goal One was "[t]o orient the instructional staff to the curricular and instructional process." This was to be achieved by first orienting principals and supervisors to the in-service plan, then preparing a cadre of trainers to conduct in-service education for the instructional staff, then conducting in-service education programs for the instructional staff, and lastly coordinating activities with the Center for Conflict and Desegregation at the University of Pittsburgh. All of these activities were completed by February 1978. (D.I.1940 at 1908–11; DX 12 at FL 12112, 12115–16)

135. Goal Three was "[t]o prepare principals and supervisors to manage instruction." This was achieved by conducting an in-service education program for principals and supervisors on various dates in March and April of 1978. (D.I.1940 at 1911–12; DX 12 at FL 12112, 12117)

136. Goal Five was "[t]o prepare the cafeteria workers, custodians, school bus drivers and secretaries to deal with educational change." This was achieved first by preparing a cadre of trainers to conduct in-service education for the cafeteria workers, custodians, school bus drivers and secretaries in the areas of cultural differences, bias/stereotyping and team building, then conducting in-service education for these employees in these areas. The former was accomplished at a March 4, 1978 training session, the latter at a session held on June 9, 1978. (D.I.1940 at 1912–13; DX 12 at FL 12112, 12119) All staff received this training. (D.I.1940 at 1913–14)

---

**31.** The parties have agreed that defendants have complied with this portion (paragraph C(5)) of the 1978 order. (D.I.1936 at 720–21)

**32.** This last facet of the court-ordered ancillary relief was addressed *supra,* under the discussion of the *Green* factors, at 41–46.

137. Goal Two was "[t]o prepare the instructional staff to implement a student orientation program." (DX 12 at 12112) These orientation activities, which related to, *inter alia*, "self-concept, feelings, decision-making, [and] coping," took place in the spring and fall of 1978. (D.I.1940 at 1914–17; DX 84)

138. Prior to September 1978, the Human Relations Division performed "significant work, ... trying to make the teaching staff sensitive to the changes that were going to occur in September." (D.I.1938 at 1314)

139. During the summer of 1978, the University of Delaware presented an in-service program for human relations personnel. Over approximately 20 days, twenty percent of the new district's teachers were trained to themselves train other teachers during a four-day session conducted prior to the commencement of the fall 1978 semester. (D.I. 1940 at 1920–21)

140. In the fall of 1978, an office of In-Service Activities was established and staffed by two full-time personnel. The office received funding and support from, *inter alia*, the Desegregation Center at the University of Pittsburgh. (D.I.1940 at 1921–23)

141. The State's Department of Public Instruction ("DPI") provided in-service training to New Castle County in the areas of "human relations and desegregation during this time period." (D.I.1940 at 1924–27)

142. The in-service training programs relating to desegregation were mandatory for faculty, staff and administrators. (D.I.1940 at 1960–62)

143. During the summer of 1979, approximately 2,028 persons participated in 146 in-service training activities. (DX 33, App. II at FL 31171)

144. By December 1979, over 300 workshop opportunities related to desegregation had been planned and conducted. (DX 33, App. II at FL 31170)

145. Of the total $161,857 spent on these programs, almost half—$81,450—went to fund building-level workshops on the identification of unmet desegregation-related needs. The objectives for these workshops included:

(1) identifying unmet desegregation-related needs specific to each school and devising strategies for addressing them; (2) evaluating the strengths and weaknesses of individual school programs in meeting desegregation-related needs; (3) identifying educational programs arising from the implementation of desegregation; (4) developing procedures to prevent race-discriminatory student assignments; (5) developing non-race-discriminatory disciplinary procedures; and (6) developing methods of encouraging student, parent and community support for and involvement in student activities. (DX 33 App. II at FL 31170–74)

146. During the fourth quarter of 1980, DPI training included a workshop on human relations techniques for selected bus drivers, cafeteria workers, and custodians designed to "help them better understand and interact with a diverse student population" and a mini-course entitled "Topics in Human Relations/Race Desegregation." (DX 42 at FL 17990)

147. Human relations specialists continued to provide in-service training through 1982. (DX 25 at 1; DX 28 at 5; DX 30 at 2; DX 32 at 1; DX 95 at FL 24341; DX 96 at FL 24356; DX 98 at FL 24369)

148. Plaintiff's expert, Dr. William M. Gordon, testified that the in-service offered by the state at the time of desegregation complied with the 1978 order. (D.I.1942 at 2667, 2786–87)

149. When the desegregation area was divided into 4 districts, in-service training continued through the Race Desegregation Assistance Center at the University of Pittsburgh ("RDAC"), DPI, and the 4 districts.

150. RDAC provided 3–day summer retreat workshops for administrators through 1987. These workshops dealt in part with awareness and appreciation of cultural differences. (D.I.1936 at 635–37)

151. RDAC also conducted 2–day regional conferences in the spring of 1980, fall of 1982, spring of 1983, spring of 1986, and spring of 1987. (DX 38; DX 39; DX 40; DX 41 at 2–3 and 4–6; and DX 49 at 17226–27, FL 17232; DX 49 at FL 17234)

152. DPI offered a number of in-service workshops related to desegregation. (DX 49 at FL 17225–50)

153. In April 1989, DPI and the Mid–Atlantic Equity Center at American University held a 1–day conference on "Educating Racially and Culturally Diverse Students for the Year 2000." (DX 51)

154. In April 1994, DPI sponsored a 2–day "Multicultural Institute" which had the following objectives: (1) "[t]o develop inter-cultural awareness[;]" (2) "[t]o serve as a pilot for future multicultural education train-ing activities for Delaware teachers, adminis-trators, etc.[;]" (3) "[t]o infuse multicultural education into Delaware school curricula[;]" (4) "[t]o provide teachers and school districts a forum for discussing and examining multi-cultural education information[;]" (5) "[t]o share relevant multicultural education re-source materials[;]" (6) "[t]o give teachers and administrators an opportunity to serve as trainers in their districts[;]" (7) "[t]o im-prove educational opportunity, self concept and achievement of all school students in-cluding those who are members of ethnic and racial groups[;]" and (8) "[t]o encourage and promote cultural pluralism in our schools." (DX 52 at FL 17632–37)

### Brandywine School District

155. From 1981 through June 1994, Bran-dywine offered a "Personalized Inservice Program" ("PIP") in which teachers were invited to choose from a menu of training topics. In June 1994, the responsibility for designing in-service training programs de-volved upon the local schools. (D.I.1939 at 1864)

156. From the 1983–84 school year through the 1993–94 school year (with the exception of school years 1988–89 and 1989–90), the record indicates that the PIP offer-ings included various workshops and courses related to desegregation, race equity and multiculturalism. (See, e.g., DX 53 at FL 19949, FL 19955, FL 19964–66; DX 54 at FL 19885A, FL 19903; DX 55 at FL 20002–03, FL 20027; DX 56; DX 57 at FL 306, FL 369, FL 372, FL 373, FL 375–76; DX 58 at FL 415; FL 455, FL 462; DX 59 at FL 515, FL 558; DX 60 at FL 605, FL 612, FL 613; DX 61 at FL 708–10)

157. In addition, all new Brandywine teachers are required to participate in a 12–hour induction program, which includes a panel discussion on issues of multicultural-ism. (DX 1939 at 1845)

### Christina School District

158. Christina also sponsors a Personal-ized Inservice Program.

159. From the 1988–89 school year through the 1994–95 school year, the record indicates that Christina's PIP offerings in-cluded various workshops and courses relat-ed to desegregation, race equity and multi-culturalism. (DX 62 at FL 14848–49; DX 63 at FL 14902; DX 64 at FL 14962; DX 65 at FL 15011; DX 66 at FL 15061; DX 67 at FL 15103–04; DX 68 at FL 15147–48)

160. A mandatory "Honoring Diversity" program was instituted in 1992–93. (D.I. 1938 at 1253–54; DX 73)

### Colonial School District

161. In March 1986, Colonial sponsored a 2–day workshop entitled "Fostering Good Human Relations in Culturally Diverse Set-tings." The workshop was attended by ap-proximately 180 teachers, administrators, guidance counselors, department chairs, edu-cational diagnosticians, team leaders, student advisors and the chairpersons of the Teacher Liaison Committees. (DX 41 at 5)

162. In 1994, 20 teachers participated in a series of 5 workshops comprising the Gen-der/Ethnic Expectations and Student Achievement staff development program. The goal of the program was to assist the teachers in "improving the academic perfor-mance of all students." (DX 199 at FL 28764)

163. In the 1992–93 and 1993–94 school years, Colonial's Teacher Learning Center offered in-service activities and courses in a number of areas including gender/ethnic ex-pectations, multiculturalism, student achieve-ment, and conflict resolution. (DX 75, 76)

### Red Clay Consolidated School District

164. In the 1980s, Red Clay sent various administrators to be trained by RDAC, and human relations specialists at Red Clay

worked with faculty and staff in the area of cultural diversity. (D.I.1936 at 635–36, 642)

165. For the 1992–93 through the 1994–95 school years, Red Clay offered in-service training on multiculturalism. (DX 79 at FL 12295, FL 12299, FL 12302, FL 12304–11, FL 12313–14; DX 80; DX 81; D.I.1939 at 1806)

### The Four Districts

166. All 4 districts offer a "rich array" of in-service programs for faculty. (D.I.1942 at 2671–72)

167. Although the focus of the programs is no longer desegregation, all 4 districts continue to offer in-service training on desegregation, race equity, and multiculturalism.

### Reading and Communication Skills

168. A reading program was instituted in the New Castle County School District ("NCCSD") in 1978, following the issuance of the 1978 order. (D.I.1940 at 1984–85)

169. The program employed 110 reading teachers, many of whom were newly hired for the program. (D.I.1940 at 1985–86)

170. These reading teachers "worked with the classroom teacher to help with testing, interpretation of those data from the tests, selection of materials, planning of program and strategies for students who needed assistance and anything that particular teacher wanted to do to help the students within that classroom." (D.I.1940 at 1988)

171. Students in grades 2 through 9 were provided assistance under the reading program if they were 1 year or more below reading level, as demonstrated by standardized test scores. Students in grades 10 through 12 were provided assistance if they were 2 years below level. (D.I.1940 at 1989)

172. Supplemental reading instruction was provided daily for 30–45 minutes, depending on grade level. For the most part, this instruction occurred in small groups within the classroom. (D.I.1940 at 1990)

173. When the NCCSD was divided into 4 districts, the supplemental reading programs were continued. (D.I.1938 at 1317; D.I.1939 at 1792–93, 1879, 1898–99; D.I.1940 at 1992–93)

174. The districts have employed at least 100 reading teachers every year since the 1981–82 school year. (DX 210; DX 211)

### Brandywine School District

175. In Brandywine, the number of reading teachers in the district at the elementary level varied between 8 and 13 during the years 1981–1994; in 1993–94, the district employed 11 reading teachers at this level. At the middle grade level (grades 6 through 8), the district employed no reading teachers between 1981 and 1994. Reading programs were established at the middle school level in 1994–95. At the secondary level, the district has employed a steadily declining number of reading teachers, from 11 in 1981–82 to 1 in 1993–94. (DX 210)

### Christina School District

176. In Christina between 1981 and 1994, the number of reading teachers at the elementary level varied between 26 and 36, with 35 teachers so employed during the 1993–94 school year. The number of reading teachers at the middle level has decreased from 5 in 1981–82 to 1 in 1993–94. Similarly, the number of secondary level reading teachers has steadily decreased from 6 in 1981–82 to 1 in 1993–94. (DX 210)

177. In the 1994–95 school year, Christina employed 1 reading resource teacher in each elementary school and at 2 middle schools. (D.I.1939 at 1879–80)

178. Reading resource teachers provide approximately 30 minutes per day of 1–on–1 or small group instruction to identified below-grade level readers not already participating in other special education programs. (D.I.1939 at 1881; DX 212 at FL 12024)

### Colonial School District

179. Reading resource teachers in individual schools perform diagnostic testing, assist classroom teachers, and help organize the reading program for the schools. (D.I. 1938 at 1317–18)

180. Students scoring in the 20th to 40th percentile on the diagnostic tests (approximately 2 years to 6 months below grade level) are targeted for supplemental reading assistance. (D.I.1938 at 1320–21)

181. All elementary and middle schools in Colonial had reading teachers in December 1994. (D.I.1939 at 1793–94; DX 210)

182. Chapter I [33] reading teachers provide 30–45 minutes daily instruction to students scoring at or below approximately the 40th–45th percentile. Students are chosen for Chapter I based on standardized test scores, informal reading inventories, teacher recommendations, some parent recommendations, and informal word recognition tests. (D.I.1939 at 1795)

183. Students not receiving Chapter I assistance who need remedial instruction are eligible for non-Chapter I reading instruction. (D.I.1939 at 1795–97)

**Red Clay Consolidated School District**

184. In some schools in Red Clay, reading resource teachers coordinate the "HOSTS" program (Help One Student to Succeed) for reading- and writing-deficient students. Under the program,[34] volunteer tutors work with individual children for 45 minutes per week. More than 300 students participate in the program. (D.I.1939 at 1884)

185. 25 parent educators hired by the Parents as Teachers program teaches first-time parents in New Castle County the importance of language and reading for pre-school children. The program has been in existence since 1987. In 1993 and 1994, the focus was on teenage parents and families with multiple needs. (D.I.1939 at 1885–89)

**Curriculum**

186. In 1973, DPI established text selection guidelines. These guidelines were revised in 1987. Both versions provided that textbooks should "[r]elate[ ] to the basic and identifiable philosophy of our democratic society by [their] . . . objective reflection of the multi-ethnic character and cultural diversity of our society [and] concerted lack of racial . . . stereotyping." (DX 124 at FL 23147; DX 125 at FL 23172)

187. When the NCCSD was created, the task force overseeing curriculum "threw out the curriculums [of the individual districts] and started with a new framework . . . ." (D.I.1938 at 1296–97)

188. In 1980, DPI distributed an annotated bibliography of supplementary multicultural materials to be used by administrators and teachers. (D.I.1940 at 1966–67; DX 123)

189. The 1978 social studies curriculum guides for grades K–6 and 7–12 both incorporated the goals of "multicultural-multiethnic education" and "global education." (DX 133 at FL 23513; DX 134 at FL 23631)

190. In 1990, DPI adopted social studies curriculum and content standards with multicultural elements. (DX 164 at FL 23203, FL 23210, FL 23219, FL 23231, FL 23233, FL 23236, FL 23247, FL 23250–53; DX 165 at FL 23259, FL 23265, FL 23267, FL 23270, FL 23271, FL 23273, FL 23275–77, FL 23283)

191. In 1990, the State Board adopted a comprehensive Policy for Multicultural Education and published guidelines. (DX 47 at FL 16321–98)

192. In April 1994, consistent with these guidelines, DPI sponsored a 2–day Multicultural Education Institute. (DX 52)

193. New DPI curriculum standards are presently being developed. (DX 166)

194. The 4 districts are now responsible for the preparation of their respective curricula.

**Brandywine School District**

195. In Brandywine, the State's and district's guidelines are used to select course materials. (D.I.1939 at 1829–30; DX 126)

196. In 1992, Brandywine assembled a Strategic Planning Committee comprised of representatives from the district and the community. This committee prepared a strategic five-year plan for the district. According to the plan, among the governing

---

**33.** "Chapter I" is a federal program to provide financial assistance to state and local educational agencies to meet the special needs of "educationally deprived" children, including children of low-income families. See 20 U.S.C. § 2701 *et seq.*, 34 CFR § 200.31.

**34.** 3 elementary schools had the HOSTS program in place in December 1994. (D.I.1939 at 1794)

values of the district was "[t]hat an [e]xcellent [s]chool [s]ystem ... [v]alue cultural diversity and fosters appreciation, understanding and acceptance." (DX 1939 at 1826–28; DX 192 at FL 28769)

197. Brandywine's K–6 Black History curriculum, prepared in 1988, is extensive. (DX 135)

198. Brandywine's social studies, library/media, language arts and music curricula also incorporate multicultural elements. (DX 136 at iv; DX 137 at ii; DX 138 at iii; DX 139 at v; DX 140 at 78)

199. Course description guides for the 1994–95 school year evidence the inclusion of multicultural elements in the art, languages, geography and United States history curricula at the district's middle schools. (DX 167 at 1, 3, 14–15; DX 168 at 1, 3, 14–15; DX 169 at 1, 3, 14–15)

200. Course selection guides for the 1994–95 school year for the district's high schools evidence the inclusion of multicultural elements in the world geography, history, anthropology/cultural diversity, African-American Studies, comparative religion/philosophy, sociology, and English curricula. (DX 170 at 6, 8–11; DX 171 at 6, 10–14, 67; DX 172 at 8, 10–14, 67)

201. Schools in the district contain multicultural resource rooms, in which multicultural materials are kept. (D.I.1939 at 1833–34)

### Christina School District

202. Christina follows the State's and the district's guidelines for selecting instructional materials. (D.I.1938 at 1246–47)

203. In selecting textbooks, Christina works with a Selection Committee composed of parents, teachers, and sometimes students. The district involves members of the minority community in making selection decisions. (D.I.1938 at 1247–48)

204. Christina's August 1994 draft Integrated Language Arts Standards include: (1) as a K–3 benchmark, that students will "read, listen and respond to a variety of literature that reflects diversity in cultures and groups;" and (2) as sixth grade objectives, that "[s]tudents will begin to understand and respect varied cultures through literature." The district's "philosophy of world language education" includes the belief "[t]hat all students should appreciate and preserve their own cultural heritage in a multicultural and multilingual society" and "[t]hat all students should become aware of the benefits of being part of a diverse American heritage as well as a global community." Christina's draft Pilot Social Studies Curriculum Guide provides that: (1) first grade students will, *inter alia,* "[d]evelop an awareness of an individual's cultural heritage and cultural heritage of other ethnic groups" and "an appreciation for the differences in cultural heritages and ethnic groups[;]" (2) first and second grade students will "[c]ompare our state and national holidays with those of other cultures[;]" and (3) sixth grade students will explore the cultures, cultural differences and cultural ties of the nations of the Western Hemisphere. Christina's secondary level *Social Studies Curriculum Guide* is directed in part toward establishing a program in which students will "develop an appreciation of other cultures, their art, government, literature and social institutions." The World Studies course especially "emphasize[s] the importance of the contribution of all ethnic groups." (DX 141 at FL 13305, FL 13316, FL 13325; DX 142 at FL 13483, FL 13496, FL 13505, FL 13590–91; DX 143 at FL 13328–30; DX 144 at FL 26484; D.I.1938 at 1252)

### Colonial School District

205. Colonial curriculum committees select instructional materials based on state and district guidelines. (D.I.1938 at 1348–51; DX 128; DX 129)

206. The district guidelines provide that instructional materials should "demonstrate[ ] consideration for the human worth and dignity of all people[,] ... objective[ly] reflect[ ] ... the multi-ethnic character and cultural diversity of our society[, and] ... lack racial and sexual stereotyping...." The guidelines also list "basic principles for minimizing sexual, racial, and other biases in instructional materials" and includes a "checklist for minimizing racial bias." (DX 129 at FL 20447, FL 20451–53, FL 20475–77)

207. Colonial's Comprehensive Language Arts curriculum (adopted August 1994) intends that "[s]tudents will develop awareness and extend understanding of the diversity and universality of human experience through language arts" and includes a bibliography of multi-cultural non-fiction and fiction. (DX 145 at FL 21429, FL 21547–61) The 1988 Foreign Language curricular guide, 1986 Social Studies curricular guides, 1991 Music curricular guide, 1988 Home Economics curricular guide, and 1990 Library/Media curricular guide all evidence multi-cultural goals. (DX 146 at FL 21265; DX 147 at FL 21082, FL 21086, FL 21094, FL 21112; DX 148 at FL 21122, FL 21127, FL 21139; DX 149 at FL 20137, FL 20150, FL 20153; DX 151 at FL 22392; DX 152 at FL 20423, FL 20439) The 1986 Social Studies curricular guide for grades 9–12 includes a ½ credit semester-long course entitled "Minorities USA," which focuses on the situations and contributions of racial and ethnic minority groups. (DX 148 at FL 21138–40)

208. Colonial's high school (William Penn) includes in its 1994–95 course offerings culturally pluralistic courses in world history, sociology and home economics ("World of Foods"). (DX 176 at FL 13033, FL 13044–45)

### Red Clay Consolidated School District

209. The July 1994 Academic Standards manual for Red Clay incorporates "a multi-cultural strand ... woven into the subject areas to enable students to appreciate the diverse cultural contributions in many fields." (DX 153 at FL 8536) The manual is used as "an umbrella in developing ... performance standards and curriculum" in the district. (D.I.1939 at 1799)

210. As for the curricula presently in place in the district, cultural pluralism can be found in the social studies, English language arts, art education and music education curriculum guides. (DX 154 at FL 8123; DX 155 at FL 10353; DX 156 at FL 8853, FL 9102, FL 9135; DX 157 at FL 10268; DX 158 at FL 10109; DX 159 at FL 8043, FL 8086; DX 160 at FL 7932; DX 161 at FL 7121; DX 162 at FL 7042–43, FL 7064)

211. The district recently adopted a new textbook series for grades K–5. The committee responsible for reviewing these texts was racially balanced. Checklists were consulted to assure that the adopted texts were free of racial bias. (D.I.1939 at 1801–03)

212. Red Clay has a district-wide Multicultural Committee. (D.I.1939 at 1804)

### Counseling and Guidance [35]

213. In the spring of 1978, the NCCSD formed a committee "to follow the directive of the Court at the time ... to develop a nondiscriminatory developmental guidance program for all students." (D.I.1937 at 1207) The committee drafted guidelines which the NCCSD adopted in the *Handbook for Certified Guidance Counselors*. (D.I.1937 at 1207–11; DX 228)

214. In 1981, DPI modified the guidelines for district and statewide use in the *Delaware Guidance Handbook, K–12*, which was itself revised in 1990 as Appendix B to the *Handbook for K–12 Education*. (D.I.1937 at 1209–11; DX 229; DX 230)

215. From 1981 to 1991, these DPI guidelines governed counseling programs within the districts.

216. In 1990, the State directed each district to prepare "a written plan describing the guidance program for the district which is reviewed periodically and updated at least every five years." (DX 230 at D 1464) Plans for each district were subsequently drafted and approved. (D.I.1937 at 1147–48, 1205–06; D.I.1938 at 1530; D.I.1939 at 1576–77; D.I.1941 at 2311; DX 230; DX 231; DX 232; DX 233; DX 234)

217. The district programs described in the plans include academic, personal and social, and "career and life-planning" counseling. (D.I.1942 at 2656)

### Brandywine School District

218. Brandywine High School has a Career Center staffed by a career technician. The Career Center "has a lot of information,

---

**35.** Counseling and guidance programs have already been described to some extent with the discussion *supra* about classroom assignment and "tracking"; those descriptions will not be repeated here.

videos, brochures, pamphlets, occupational outlook handbooks, that type of thing." Ninth and tenth grade students are provided orientation to the Career Center. The school also offers the Discover program. (D.I.1939 at 1584–85, 1589)

219. Guest speakers occasionally come to the school to talk about different careers. Part-time and, occasionally, full-time jobs are posted on a job board outside the counselor's office. (D.I.1939 at 1585)

220. Inroads, Upward Bound, and Aspire are available in the Brandywine District. (D.I.1939 at 1586–87)

221. During the fall of the eleventh grade year, counselors provide students with information about the PSAT. Later that year, counselors talk to eleventh grade students in their classes about "the college tuition process, what they should be doing in [their] junior year, how to do their college research, [and] how to differentiate" between schools. In the spring of the eleventh grade year, counselors meet with students individually to discuss college planning. During the senior year, counselors meet with students in groups and individually to assist in preparing college applications. (D.I.1939 at 1587–89)

222. The district sponsors a financial aid night in January of each year, at which, *inter alia*, counselors talk about scholarships and discuss the college application process. Flyers are sent to parents to notify them about this meeting, and they are announced to students over the school public address system. (D.I.1939 at 1589–90)

### Christina School District

223. Newark High School offers the Discover package. In addition, the school offers a Jobs for Delaware Graduates program and a Warranty jobs program in connection with Junior Achievement. All students are eligible for and receive notice of these programs. (D.I.1938 at 1538–39)

224. The school employs a minority counselor who works with the Aspire, Talent Search, and Upward Bound programs. These programs, offered in the district, are directed to minorities, but are open to all students. (D.I.1938 at 1539–40)

225. FAME and Inroads are also available in the district. (D.I.1938 at 1540)

226. Newark High School participates in the annual College Night program. In addition, 80–100 college admission counselors visit the school during the year. Notice of these visits is announced, posted, and published. (D.I.1938 at 1541)

227. Information about PSAT and SAT testing is provided to all students, and individual assistance with college applications is provided. Parents are invited to meet with counselors on an individual basis in the evenings. (D.I.1938 at 1541–43)

### Colonial School District

228. William Penn High School has a career center staffed by a full-time career counselor, an aide, and secretarial staff. The career center "expose[s] the students to many different opportunities and a forum of guest speakers [and] field trips to local companies." (D.I.1937 at 1153)

229. The school also has "an extensive work/study program" and sponsors a "career day, where we bring in professionals from the area." (D.I.1937 at 1154)

230. The Aspire Program, which is directed to minority students with an interest in the field of education, is also available to students. Eligible students participating in the Aspire program are provided transportation to the University of Delaware, given a mini-lesson and lectured on SAT testing, given lunch, and returned home. The following career programs are also available: FAME (Foundation to Advance Minorities in Engineering), which has "certain prerequisites"; "Inroads," which exposes minority students to professional jobs available and may lead to summer internships; "Talent Search," which is directed to all students interested in continuing their education and has no prerequisite; and "Upward Bound," which is directed toward students interested in higher education. (D.I.1937 at 1154–55, 1218–21)

231. Students are made aware of these programs through flyers sent to home rooms and guidance counselors speaking before English classes. In addition, where the program has participation requirements, e.g., a strong record in a particular discipline, coun-

selors might try to identify eligible students and "try and convince the student to participate in that activity or program." (D.I.1937 at 1155–56)

232. Colonial also provides assistance in the college application process, starting in the ninth grade, when presentations are made about the PSAT and SAT. (D.I.1937 at 1156)

233. Colonial "bring[s] in excess of a hundred college reps a year" and "take[s] students on field trips to different colleges." (D.I.1937 at 1157)

234. The district holds an annual financial aid workshop for parents and students. (D.I.1937 at 1157)

### Red Clay Consolidated School District

235. Tenth grade students in the district are encouraged to take the Armed Services Vocational Test Battery to help them identify career interests. In addition, counselors work with Business and Industry in Education (BIE), which provides speakers, and the Boy Scouts of America, which provides lists of speakers. Students are also surveyed on career interests. (D.I.1937 at 1216–17) Notices of coming speakers are posted and announcements are made. (D.I.1937 at 1218)

236. At Alexis I. duPont High School, for example, the guidance department makes career materials available to students and has two computer terminals through which students can access career, college, and vocational information.

237. The computer options include the Discover System, which includes lists of colleges, jobs, and interests. (D.I.1937 at 1216)

238. Red Clay participates in the Aspire, Upward Bound, Inroads, FAME, Talent Search, and Achievers programs. The Achievers program is designed to increase achievement in minority students. (D.I.1937 at 1218–21)

239. The district has "an extensive college visitation program where colleges come and ... recruit students." Minority alumni have requested and been provided lists of students to mentor. (D.I.1937 at 1222–23)

### Recognition of Human Values

240. In response to the 1978 order, the NCCPBE's Human Relations Task Force drafted a Human Relations Program (the "blue book"). (D.I.1937 at 1180; DX 102) The blue book provided for a supervisor for human relations and a deputy superintendent to report directly to the superintendent of the county-wide district. (D.I.1937 at 1180–81)

241. More than 100 specialists were hired to work directly under the supervisor. They were assigned to schools in biracial teams, with at least 1 team per high school and 1 team per middle school. The teams were also directed to serve a number of elementary schools. (D.I.1937 at 1181)

242. The human relations specialists were trained to meet the state certification requirement for human relations (15 credits in human relations). (D.I.1937 at 1182)

243. The programs prescribed by the blue book included "peer tutoring," a way to assist students who were having academic difficulties by those students who were being reasonably successful. Biracial Human Relations Student Advisory Committees, which existed in all of the high schools, were formed "to create a positive multi-cultural school climate." (D.I.1937 at 1185–86; DX 102 at P 3001, P 3008–09; DX 104)

244. The Home/School Liaison Program was implemented in 1978 "to work directly with students and their parents." In 1982, it was combined with the human relations program. (D.I.1937 at 1190)

245. Richard Faatz was assigned "to monitor the implementation of the [1978] order to make sure that students were treated equitably and fairly." He and his colleagues "developed a school climate indicator to take a number of factors into account: Student involvement in activities, student involvement in athletics, classes[,] ... suspensions." These data were added to data collected from the human relations specialists at the schools, and then analyzed "to make a comparison of how the schools were doing with one another." When a school was "out of line," Faatz "sent a team ... into the school and observed what was going on there for a week."

Students, faculty, parents and administrators were also interviewed. The human relations staff then met with school administrators to recommend changes. (D.I.1937 at 1188–89)

246. Plaintiff's expert, Dr. William M. Gordon, testified that the NCCSD program was sufficient to comply with the 1978 order. (D.I.1942 at 2786–87)

247. One function of the human relations specialists was crisis intervention. When no crisis in the desegregation process occurred (D.I.1937 at 1183–84), the perceived need for human relations specialists lessened. The number of specialists "went down into the eighties, then into the forties ... over the period of the three years of the existence of the New Castle County [School] District, and the first year of the existence of the four districts." In addition, the program focus shifted to fostering "multi-cultural awareness, decision-making, problem-solving, that kind of thing" on a group, rather than individual, level. "The human relations specialists ... moved more toward the development of programs in the school." (D.I.1937 at 1179, 1184–85)

### Brandywine School District

248. Brandywine employed 10 human relations specialists (including home/school advisors) in 1981–82, 9 in 1982–84, 1 between 1984 and 1990, and none thereafter. (DX 111)

249. Human relations services are now provided by guidance counselors, social workers, and assistants to the principals, the numbers of which have increased. (D.I.1939 at 1841; DX 111)

250. In addition, some human relations functions have been moved into the curriculum. "For example, in a number of schools, we have something called peer counseling and conflict resolution management, where a problem at the K–3 level, students try to mediate problems between students." (D.I. 1939 at 1841)

251. Brandywine employs a community outreach person and visiting teachers to work in the community. These efforts are

similar to those of the earlier human relations specialists. (D.I.1939 at 1843–44, 1869)

### Christina School District

252. When the 4 districts were created, Christina had 17 human relations specialists and home/school advisors. In 1984, the number was reduced to 7. It has remained at 7 or 8 each year since 1984. (DX 111)

253. These human relations personnel "did essentially the same programming that had occurred in the county, a lot of peer counseling, a lot of peer tutoring. They implemented the sociodrama program that's sponsored by [the National Conference of Christians and Jews]. They did a lot of advisory council work, a lot of individual counseling of the students to assist them as they went through the process." (D.I.1937 at 1191)

254. "[E]lementary school guidance counselors" and "a lot of support people" came to perform human relations functions. (D.I. 1937 at 1192, 1194)

255. In 1982, the STRIVE program was introduced as an "intergroup relations program that serves students from the beginning of the school all the way through and including ninth grade...." STRIVE's mission includes "encourag[ing] appreciation of human similarities and differences [and] nurtur[ing] self-esteem, self-respect and respect for others." "[I]t helps students to be aware of their relationships with one another." (D.I.1937 at 1193; DX 112 at FL 11838)

256. Between 2,986 and 4,929 students participated in STRIVE programs each year between 1982–83 and 1993–94. (DX 114) [36]

### Colonial School District

257. Colonial employed 10 human relations specialists and home/school advisors in 1981–82, 8 in 1982–83, and 5 in 1983–84; the district has employed no human relations specialists or home/school advisors since that time. (DX 111)

258. In 1982, Colonial used local funds to hire 8 elementary guidance counselors "dedi-

---

36. STRIVE was also offered in the other districts. Each year between 1982–83 and 1993–94, the number of Brandywine students participating ranged from 2,172 to 3,390; in Colonial, the numbers ranged from 876 to 3,200; and in Red Clay, from 2,177 to 3,897. (DX 114)

cated solely to the support of students and their families...." (D.I.1938 at 1310, 1311; DX 111) "[T]heir job was primarily to provide preventive-type lessons or instructional units to the classrooms and to deal with referrals on a one-on-one basis if the counselor thought that was more appropriate." They also worked with parents and teachers. (D.I.1938 at 1337)

259. At the middle school level, the home/school advisor and human relations specialist positions were combined into 3 student advisor positions to assist the principals as "troubleshooter[s] in the area of student relations with the school." (D.I.1938 at 1311–12, 1335, 1339–40)

260. Colonial's only high school employs a crisis intervention specialist. (D.I.1938 at 1337–38)

### Red Clay Consolidated School District

261. Red Clay employed 16 human relations specialists and home/school advisors in 1981–82 and 18 in 1982–83; thereafter the number steadily diminished from 14 in 1983–84 to 2 in 1992–93. In 1993–94, the district employed 5 human relations specialists and home/school advisors. (DX 111)

262. In the early 1980s, the human relations specialists were "putting out fires," including "doing a lot of work with parent groups." (D.I.1936 at 642) By the late 1989–91, "the thrust of human relations changed dramatically." (D.I.1936 at 638) Human relations specialists became student relations specialists, working with targeted, at-risk students and developing links between the school and the community. (D.I. 1936 at 638; DX 120)

263. Further, according to Dr. Patton, Director of Human Resources: "We ... found that there [were] new needs in the school and the school needs tend to be one-on-one counseling with students.... [T]o meet that need we have brought aboard the elementary counselors in significant numbers. Every school has the services of an elementary counselor." (D.I.1936 at 638–39)

264. In January 1993, Red Clay hired 2 intervention specialists "to work as social workers" for "10, 15 children.... They were supposed to ... make sure that ... the children came to school, ... [to] monitor[ ] their progress in terms of their academic work. And they were to be mentors" and advocates. (D.I.1936 at 640–41; DX 121)

265. The intervention specialists and student relations specialists, together with home school visitors, form the School Climate Team. (D.I.1936 at 639)

### Standards of Conduct

266. In July 1978, the NCCSD adopted a code of conduct drafted by a "committee [who had] gathered similar documents from Delaware and large desegregated school districts for review." (DX 21 at 3; DX 22 at 2) Prior to adoption, drafts of the code were reviewed by citizen groups, student council leaders, the Teachers' Association, and administrators. (DX 21 at 2–3; DX 22 at 3)

267. The districts adopted the NCCSD code in 1981.

268. Each district has revised the code periodically since then, through a "process of development and continual revision that includes [the] involvement of others, that includes teachers, includes administrators, and there are processes for the codes to be reviewed by external sources and have input." (D.I.1937 at 1004)

269. The codes[37] are not discriminatory on their face. (D.I.1942 at 2735)

270. The codes are written in quasi-legal language and are not easily readable. (D.I. 1937 at 1001; D.I.1942 at 2618)

271. The codes, however, are explained to students at their respective levels. (D.I.1937 at 1001–02; D.I.1945 at 3925–27)

272. The codes contain language which allows for subjective interpretation, for instance, "general classroom disruption," "defiance of school authority," or "general disruption of the orderly educational process." (D.I.1942 at 2620; D.I.1940 at 2132–33)

273. As Dr. Iris Metts testified, because it is impossible to anticipate and/or identify every manifestation of possible misbehavior, some general language is essential in order

37. The NCCSD code and each district code.

to give to teachers and administrators the professional independence they require to control their classrooms and schools. (D.I. 1945 at 3920–23)

274. The codes are not applied in a discriminatory fashion.[38]

a. Dr. Charles Achilles, a defense expert, employed "suspension indices" to test whether discipline was disproportionately applied to black students. Using 1993–94 data from the combined 4 districts, Dr. Achilles calculated that 56% of the total suspensions were given to black students, while the black student enrollment in the 4 districts was 31%. Dividing 56 by 31, Dr. Achilles found a total suspension index of 1.81, representing "the index of suspensions to black students in the four districts." (D.I.1937 at 1007–08)

b. Because some students get suspended more than once, Dr. Achilles also calculated a "students suspended" index. This calculation involved dividing the percentage of students suspended in a particular group by the percentage of that group's enrollment. Using the 1993–94 data, Dr. Achilles found that the percentage of black students suspended was 54.3%. Dividing that number by the black student enrollment (31%) produced a students suspended index of 1.75. (D.I.1937 at 1009)

c. A suspension index of 1.0 would mean that the suspensions of the group and the group's enrollment would be the same.

d. Applying this methodology, Dr. Achilles performed three types of tests. First, he looked at external data sets or at the behavior of black students outside of the districts, independent of the school districts.

Second, he performed "tests of consistency[,] ... to see if the behaviors and the suspensions seemed to be consistent." Third, he tested "the discretion of the person in charge of the discipline," to see whether discretion influenced the suspension indices. (D.I.1937 at 1016)

e. Dr. Achilles first compared the 1993–94 suspension indices with a students suspended index based on suspension data from the 1993 Office for Civil Rights data. The latter evidences a black population percentage of 16% and a black suspension percentage of 32%. Thus, the national student suspended index for black students is 2.0. (D.I. 1937 at 1016–19; DX 328) Dr. Achilles also compared the same indices with an index based on the arrest index of black youth arrested in Delaware, producing an index of 2.09. (D.I.1937 at 1019–20)

f. Dr. Achilles next evaluated three measures of consistency. In his first consistency analysis, Dr. Achilles compared students- and total-suspended indices for black students in each of the 4 districts. The indices were essentially consistent, a result difficult to achieve if equitable nondiscriminatory codes were not being used and applied in an equitable, nondiscriminatory manner. (D.I. 1937 at 1022–23; DX 331)

g. There also was consistency in how the codes were applied by administrators, regardless of the administrators' race. (D.I. 1937 at 1028–29; DX 332)

275. The districts employ a continuum of intervention and a range of alternative sanctions,[39] which constitute good educational practice. (D.I.1942 at 2738; D.I.1945 at 3923–24, 3926, 3934–36)

---

**38.** The court rejects the assumption, upon which plaintiff's expert, Dr. Gordon, based his testimony (PX 2193–2196), that "indiscipline" or misbehavior is a randomly distributed characteristic among racial groups, an assumption unsupported by any study or authoritative literature. (D.I. 1942 at 2752) The court also rejects any statistics as skewed which do not account for the fact that a small core of students account for a large percentage of the disciplinary instances; i.e., the

fact that black students may account for a greater proportion of suspensions than their proportion in the general student population is essentially meaningless if only a handful of black students is responsible for multiple suspensions. (D.I.1937 at 1035–36)

**39.** These include programs of conflict resolution and mediation, reprimand and counselling, in-house suspensions, suspensions, and expulsions.

## C. Areas of Concern
## Student Achievement

276. Various demographic data[40] demonstrate that there is a "black/white gap" in the desegregation area and New Castle County generally as to the following socioeconomic measures.

a. Black households are 2.54 times as likely as white households to have a reporting householder who lacks a high school degree. (D.I.1935 at 323; DX 307)

b. Black households are 6.47 times as likely as white households to have children categorized as being in poverty. (D.I.1935 at 327–28; DX 309)

c. Black households with children are 3.55 times as likely as white households with children to have incomes under $25,000 a year. (D.I.1935 at 333; DX 311)

d. 4 times as many black students as white students are eligible to participate in the federally subsided lunch program. (D.I. 1935 at 336; D.I.1936 at 809–10)

e. Blacks are 2.86 times as likely as whites to be unemployed. (D.I.1935 at 331–32; DX 313)

f. Black households with children are 3.21 times as likely as white households with children to be headed by a single parent. (D.I. 1935 at 340; DX 314)

g. The black teenage fertility rate is 4 times the white teenage fertility rate. (D.I. 1935 at 339; DX 316)

h. Single black women are 5 times as likely as single white women to give birth to a child. (D.I.1935 at 341–42; DX 317)

i. Black children are 3.36 times as likely as white children to be born at a very low birth weight. (D.I.1935 at 343; DX 318)

j. Black children are 5.25 times as likely as white children to have been born following inadequate prenatal care. (D.I.1935 at 344–45; DX 319)

k. The rate of infant mortality among the black population is 2.42 times higher than the rate of infant mortality for the white population. (D.I.1935 at 345–46; DX 320)

l. To the extent the above measures were compared among the 4 school districts, the black/white gap was closer in Colonial than in the other three. (D.I.1935 at 325–6, 349; DX 322)

m. The average white student lives in a Census tract where 51% of the adults have some college education; the average black student lives in a Census tract where only 33% of the adults have some college education. (D.I.1936 at 808–09)

n. Blacks in the desegregation area are in an inferior position economically to whites, and that gap is wider in New Castle County than it is in the nation as a whole. (D.I.1935 at 336–37)

o. There is consistency between the gap in socioeconomic status with the gap in achievement, with Brandywine statistics demonstrating the greatest disparity in both areas, Colonial the least disparity. (D.I.1939 at 1659–67)

277. There is an "achievement" gap between black and white students in the desegregation area.

a. The average reading score for sixth graders in 1992 ranged from 55.6 for white students to 39 for black students, with 50 being the national norm. (D.I.1936 at 802–05)

b. The average mathematical achievement score for sixth graders in 1992 ranged from 52 for white students to 36 for black students, with 50 being the national norm. (D.I.1936 at 805–07)

278. A regression analysis conducted by Dr. Armor, which compared educational outcomes (based on achievement test scores and "dropout" statistics as of the spring of 1992) with socioeconomic status (based on 4 variables—free lunch status of students, "AFDC"[41] status of students, percentage of

---

**40.** Generally compiled from the 1990 U.S. Census and the 1992 Vital Statistics Report of Delaware.

**41.** AFDC is a joint federal-state public assistance program authorized by 42 U.S.C. § 601 et seq. The AFDC program "is designed to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them." Shea v. Vialpando, 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974).

adults with college education separated by race, and percentage of renters separated by race, plus gender) predicted 80–96% of the black students' achievement levels. (D.I. 1936 at 796–97, 813–22)

a. The observed achievement gap in sixth grade reading scores was 16.7; the predicted gap was 13.5. (D.I.1936 at 814–16)

b. The observed achievement gap in sixth grade math scores was 16.5; the predicted gap was 14.2 (D.I.1936 at 817)

c. Using first grade scores as a predictor, the difference between the observed and predicted gaps (in reading, 17.0 observed versus 14.8 predicted; in math, 16.8 observed versus 16.1 predicted) narrows. (D.I.1936 at 819–20)

d. Using more sophisticated measures of socioeconomic status, such as child-rearing practices, the predicted differences in achievement by race narrows, if not disappears. (D.I.1936 at 822–25)

279. Nationally, there has always been a gap between black and white citizens when socioeconomic characteristics are compared. (D.I.1939 at 1708)

280. The black/white achievement gap is a national phenomenon, documented at least by the mid–1960s in the "Coleman report." [42] (D.I.1936 at 794–95; D.I.1939 at 1639–41, 1704–06)

281. There is also an achievement gap between whites in poverty and whites not in poverty, and between whites and Asian Americans. (D.I.1939 at 1642–44)

282. The record noted several studies which demonstrate that if socioeconomic characteristics are more equalized, achievement levels are more equalized. (D.I.1939 at 1755–56)

283. According to Dr. Herbert Walberg, a defense expert, there are 9 factors that affect educational productivity.

a. Student aptitude.

1) Ability or prior achievement.

2) Development as indexed by chronological age or stage of maturation.

3) Motivation or self-concept as indicated by personality tests or the student's willingness to persevere intensively on learning tasks.

b. Instruction.

1) The amount of time students engage in learning.

2) The quality of the instructional experience including method (psychological) and curricular (content) aspects.

c. Psychological environments.

1) The curricular of the home.

2) The morale or student perception of the classroom social group.

3) The peer group outside school.

4) Minimal leisure-time television viewing. (DX 339)

284. Differences among children in relation to the above 9 factors, in addition to economic disparities, are predictive of future achievement. (D.I.1939 at 1626–29; DX 340)

285. It is difficult for children to take equal advantage of learning opportunities absent the initial and cumulative advantages of a stimulating home curriculum. (D.I.1939 at 1634–35)

286. Because the environment outside school is so strong, cumulative, and varied, schools cannot overcome such environmental/differences among children. (D.I.1939 at 1635–38; DX 344)

**Special Education**

287. Special education has been defined as "a means to provide specially-designed instruction and related services to students with special needs." (D.I.1938 at 1436; D.I. 1944 at 3320)

288. The goal of special education is to enable children to progress through the educational program at grade level with their peers. (D.I.1944 at 3564–66)

289. "Special needs" are organized into categories of disabilities and are typically

**42.** The report, titled "Equality of Educational Opportunity," was commissioned by the Civil Rights Act of 1964 and was one of the first studies of the equality of educational opportunity in the country. (D.I.1936 at 725)

diagnosed according to quite stringent criteria created and followed by specialists. (D.I. 1938 at 1436)

290. There are 12 categories of disability recognized in Delaware, listed in the DPI administrative manual for special education: autism, developmental delay, deaf/blind, hearing impairment, learning disability, mental disability (3 sub-types—educable mental handicap, trainable mental handicap, severe mental handicap), physical impairment, preschool speech delay, serious emotional disturbance, speech and/or language impairment, traumatic brain injury, visual impairment. (D.I.1938 at 1437–38)

291. In reviewing special education participation by category (all districts): (1) 73% of the children participating in special education are classified as having a learning disability; (2) 9% are classified as having an educable mental handicap; (3) 8% are classified in other categories; (4) 5% are classified as having a serious emotional disturbance; (5) 4% are classified as having a trainable mental handicap; and (6) 1% are classified as having a severe mental handicap. (D.I.1938 at 1438–39; DX 359)

292. The term "educational assessment and placement" involves the following stages: (1) the pre-referral stage; (2) a request for referral based on a record of learning difficulties (parental consent required); (3) a multidisciplinary team ("MDT") evaluation; (4) development of an "individualized educational program" ("IEP") by another team of professionals and the parents; (5) selection of the "least restrictive environment" ("LRE") placement option (parental approval required). (D.I.1938 at 1442–44, 1450–52; D.I.1944 at 3322–23)

293. The last factor, placement in the "least restrictive environment," is a primary concern. (D.I.1944 at 3561–62)

294. Placement in the 4 districts is classified as follows: (1) "Level 1" services involve bringing all of the special education services into the regular classroom (for less than half of the instructional time); (2) "Level 2" services involve "resource teaching programs," i.e., children are taken out of regular classrooms for periods of time to receive special education instruction typically that is focused in 1 or 2 areas of difficulty (for less than half of the instructional time); (3) "Level 3" services involve self-contained classes that have a low student-to-teacher ratio, typically located in regular education attendance centers (full-time special education instruction); (4) "Level 4" services involve center-based programs, meaning that there is a special school or special center where children with disabilities receive their entire educational program (full-time). (D.I.1938 at 1452–55; D.I.1944 at 3444–45; PX 2159)

295. The distinction between "part-time" (less than 750 minutes a week) and "full-time" (more than 750 minutes a week) special education programs is not particularly relevant to the placement issue; i.e., knowing the number of minutes of special education instruction a child receives does not indicate with whom the child has received his/her special education instruction. Therefore, calling "part-time" programs "least restrictive" and "full-time" programs "restrictive" is an unhelpful characterization. (D.I.1944 at 3432, 3442, 3447, 3453–54)

296. The percentage of minority students in special education programs in the 4 districts is higher than the percentage of minority students in the general population.[43]

297. The disproportionate placement of minority students in special education programs is a national concern and a matter of national debate. (D.I.1938 at 1465–67; PX 2237 at 14, 17–22; PX 2238 at 15–16)

298. Poverty[44] increases the risk for development of disabilities. (PX 2159 at 20)

299. When the poverty level is equalized between races, the disparity between races in special education participation narrows, but

---

43. Overall minority (black and Hispanic) enrollment for all four districts is 31.1%; minority enrollment in special education programs is 45.4%. (D.I.1944 at 3477–78; D.I.1938 at 1460–61)

44. For instance, the presence of: (1) biomedical factors (e.g., low birth weight, exposure to lead, etc.); and (2) sociocultural factors (e.g., behavioral guidance). (D.I.1938 at 1468–71, 1518–19; PX 2238 at 13)

is not eliminated.[45]  (D.I.1938 at 1471–75, 1513, 1525–26;  DX 361, 362)

300.  70% of minority students (as compared with 73% of white students) receive their special education instruction in part-time programs, spending the majority of their time in regular education settings. 90% of all special education students receive their special education instruction in regular education settings.  (D.I.1938 at 1476–77; DX 363)

301.  The differences in placement are not statistically significant.  (D.I.1938 at 1478)

302.  Special education is not used as a means to separate students by race in these 4 districts.  (D.I.1938 at 1478)

303.  There is no evidence of discrimination in state and local operations manuals. (D.I.1938 at 1457)

304.  There is no evidence that minority students are treated differently in the determination of eligibility for special education.[46]

a.  There were 1.96 pre-referral interventions per black student and 1.82 pre-referral interventions per white student; i.e., there are no significant differences.  (D.I.1938 at 1492–93;  DX 364)

b.  There are no significant differences between black and white students as to grade referred and grade at initial placement. (D.I.1938 at 1494)

c.  The same kinds of concerns exist at the time of referral regardless of race; these concerns are centered on issues related to intellectual abilities and issues related to overall achievement (i.e., assessment of intellectual abilities, under-achievement, suspected developmental lag, speech/language problems, speech/communication problems). (D.I.1938 at 1497–98;  DX 366)

d.  Black and white students who are in learning disabilities programs[47] in the 4 districts have very similar characteristics in the

following areas: (1) basic reading, reading comprehension, and written expression; (2) math computation and math reasoning; (3) oral expression and listening comprehension. (D.I.1938 at 1503–06;  DX 368)

e.  There are no statistically significant differences among racial groups vis-a-vis best test scores (i.e., measures of current intellectual functioning).  (D.I.1938 at 1499–1503; DX 367)

f.  There are no statistically significant differences among racial groups vis-a-vis individualized education program goals.  (D.I. 1938 at 1506–07;  DX 369)

g.  There are no statistically significant differences among racial groups vis-a-vis family participation at the initial IEP and the annual review of the IEP.  (D.I.1938 at 1508–09;  DX 370)

305.  Since at least 1989, there has been greater integration of special education children in regular classroom settings.  (D.I. 1944 at 3509–17)

**Dropout Rates**

306.  Dropping out of school is a process, symptomatic of poor performance, discipline problems, and lack of participation in extra-curricular activities and guidance programs. (D.I.1936 at 835;  D.I.1942 at 2644)

307.  There are differences by race in the dropout rates in the 4 districts.  (D.I.1936 at 833–34;  DX 273 at Fig. III–9)

a.  In Brandywine, there is a 2.9% dropout rate for white students and an 8.2% rate for black students.

b.  In Christina, there is an 11.3% dropout rate for white students and a 21.3% rate for black students.

c.  In Colonial, there is a 15.3% dropout rate for white students and a lower 10.9%

---

45.  Dr. Daniel J. Reschly, defendants' expert, opined that with better measures of poverty (free lunch, used here, is dichotomous), the gap would be further reduced, if not eliminated.

46.  Plaintiff's expert, Dr. David Rostetter, opined that the "same" treatment is not "equal" treatment in special education, that there should be

"tailored assessments" and "heightened" treatment and consideration for children from different cultures and races.  (D.I.1944 at 3371–72)

47.  A learning disability is defined as "a severe discrepancy between current intellectual functioning and academic achievement."  (D.I.1938 at 1445)

rate for black students.[48]

d. In Red Clay, there is a 9.7% dropout rate for white students and an 18.1% rate for black students.

308. Using a regression analysis, eighth grade achievement levels predict the differential dropout rate. (D.I.1936 at 834–37)

## IV. CONCLUSIONS OF LAW

Although the attainment of "unitary status" has been the ostensible goal of this forty-plus-year litigation, the concept of "unitariness" is a kaleidoscope of sometimes conflicting and certainly evolving principles reflecting the social, political, educational, and jurisprudential thought which has molded the school desegregation process since 1954. For years, the courts involved in the school desegregation process have professed to impose only "limited" remedial relief, concomitantly stating as their purported goal a "status" in which "all the vestiges of past discrimination have been eliminated." The courts have rejected the use of racial quotas and the requirement of racial balance, yet have established "racial identifiability" as the one clear "vestige" of a dual system. Although the courts' supervisory tenure has been described as only a temporary divestiture of local control in order to accomplish "school desegregation," many courts have demanded evidence of broader societal integration, expanding the original concept of "equal opportunity" to encompass "equal achievement."

The articulated goal of *Brown I and II* was a straightforward one: "admission [of the plaintiff class] to public schools as soon as practicable on a nondiscriminatory basis," *Brown II*, 349 U.S. at 300, 75 S.Ct. at 756; i.e., no public school could deny admission to any child on the basis of his or her race. The anticipated obstacles to this desegregation process were described as practical problems, such as those "related to administration, arising from the physical condition of the school plant, the school transportation

system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools." *Id.*

The case law generated in the first decade of the Delaware litigation likewise reflects the view that the goal of the desegregation process was to provide a "wholly integrated" school system in which children could attend public schools without regard for race or color. *Evans v. Ennis*, 281 F.2d at 391–92. It was contemplated that the formerly all-white schools would simply absorb the new black students as they chose to abandon the formerly all-black schools. *Id.*

By 1968, however, simply opening the doors of the public schools to all children, regardless of race, was deemed legally insufficient if black children still attended schools which were "racially identifiable" in terms of the composition of their student bodies and their "faculty, staff, transportation, extracurricular activities and facilities." *Green*, 391 U.S. at 435, 88 S.Ct. at 1693. In this context, the mandate to "dismantle the dual system" became virtually synonymous with a requirement to eliminate racially identifiable schools.

The court here, for example, having found the schools in the former Wilmington School District to be racially identifiable, ordered the submission of a desegregation plan requiring that school "enrollments in each grade range between 10 and 35% black."[49] *Evans v. Buchanan*, 416 F.Supp. at 356. The Third Circuit, although it disapproved of the "10–35% enrollment criterion" and held "that no particular racial balance will be required in any school, grade, or classroom," *Evans v. Buchanan*, 555 F.2d at 380, nevertheless endorsed the need for an interdistrict remedy. Likewise, although the subsequently issued 1978 order required no more than a "9–3" pupil assignment plan, *Evans v. Buchanan*, 447 F.Supp. at 1008, decades later, much of the evidence presented in the case at bar has been directed at demonstrating the

---

**48.** Colonial is the most homogenous of the 4 districts in terms of the socioeconomic characteristics of its population.

**49.** The court opted for the 10–35% enrollment requirement rather than a "15% variation on either side of the actual minority school age population...." *Evans v. Buchanan*, 416 F.Supp. at 356.

existence of "particular racial balance[s]" in each "school, grade, [and] classroom." [50]

The record at bar demonstrates that the 4 districts have complied with the court-ordered "9–3" pupil assignment plan. The record demonstrates that black and white children who are neighbors do attend the same public school (although the school itself most likely is not located in that neighborhood), and there is no credible evidence linking any current racially identifiable conditions [51] to the prior violation.

With respect to the ancillary relief ordered in 1978, the record at bar demonstrates that the 4 districts complied in good faith during the critical initial stages of the court-ordered interdistrict remedy, a stage of the desegregation process which was completed in a highly successful manner. The evidence further demonstrates, however, that the delivery of certain aspects of the court-ordered ancillary relief has changed in character and scope over the ensuing years. Most significantly, the focus of the relief has shifted from the desegregation process itself to the fact of a multicultural student body with varying educational problems. [52]

Given the absence in the court's prior orders of any specific goals or articulated limits, other than the immediate implementation of the "9–3" pupil assignment plan and the future achievement of "unitariness," the court today finds that the defendants have complied in good faith with the ancillary aspects of the 1978 order and that the changing nature of defendants' compliance is consistent with the transition to a unitary system.

The final area of review includes those concerns never substantively addressed by the court during its supervision, but identified by the plaintiff class as worthy of the court's concern. The evidence presented at bar demonstrates that no two children share the exact same educational experience because of the myriad of factors—both intramural and extramural—which shape their individual experiences. The evidence also demonstrates that the intramural or school environment cannot be expected to make up for deficiencies in the child's extramural environment. [53] There is no credible evidence demonstrating that the differences between black and white children's success in school can be attributed to the former de jure segregated school system. [54]

The continued existence of racial discrimination in our society as a whole, and the effect of that discrimination on the ability of a black child to enter school on an equal footing with more privileged white schoolmates, are not matters in dispute in this litigation. And, indeed, as the years have passed since Brown I and II, it has become apparent that the school desegregation process has been unable to eliminate or overcome racial discrimination in the "myriad factors of human existence" outside the school environment, as predicted by the Supreme Court in Swann, 402 U.S. at 22, 91 S.Ct. at 1279.

Based upon an examination of the 4 districts in all of their facets, the court concludes that the defendants have complied in good faith with the desegregation decrees issued in this litigation, that the defendants are unlikely to return to the segregative practices of their predecessors, and that the

**50.** Clearly these racial balances were only achieved in the first instance by destroying the fabric of the neighborhood school system in Northern New Castle County (importantly, including that of the City of Wilmington) and can only be sustained into the future (absent massive demographic changes) by maintaining the court-ordered interdistrict transportation of students indefinitely.

**51.** In other words, the Green factors.

**52.** One of the fundamental issues implicitly posed by this litigation is whether the time has come to return the focus of the public school

system to matters of quality education rather than social policy.

**53.** A point illustrated by the desegregation process in Kansas City, Missouri.

**54.** Aside from the problem of having no base line from which to compare the plaintiff class's educational progress in the desegregation process, much of the discussion in these areas of concern, particularly regarding special education and "tracking," reflect more a philosophical debate among educators on educational issues than the identification of vestiges of past discrimination in the former de jure segregated school system.

vestiges of past discrimination have been eliminated to the extent practicable. The doors of the public school system have been opened to all children, regardless of their color. All children, regardless of their color, are presented with the opportunity to learn and to succeed, building upon their education. It is time for the federal court to end its supervision of the public school system of Northern New Castle County.

Defendants' motion for a declaration of unitary status (D.I.1542) will be granted. An order shall issue.